[No. 56524–4. En Banc. April 11, 1991.]

*In the Matter of the Personal Restraint of* CHARLES LEON TEDDINGTON, *Petitioner.*

*Michael Danko,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Theresa L. Fricke, Senior Appellate Attorney,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

In 1985, petitioner Charles Leon Teddington was convicted of murder in the first degree. His conviction was affirmed on appeal in an unpublished opinion.[1]

In this review of a denial of his personal restraint petition by the Court of Appeals, petitioner challenges his conviction on the ground that certain evidence admitted at his murder trial was obtained in violation of his constitutional rights.

When arrested for murder, petitioner was in the Army and stationed at Fort Lewis. After his arrest by civilian authorities, his commanding officer ordered that his on–base property be inventoried and placed in storage. During the search of his locker, a letter written by petitioner was discovered which indicated that he had gone to Seattle the day of the killing in order to assist in a robbery. At the hearing on the motion to suppress, evidence was introduced, and the trial court found, that such an inventory is standard military procedure whenever a soldier is away from his quarters for an indeterminable period of time.

---

[1]*State v. Teddington,* 49 Wn. App. 1015 (1987).

Petitioner's platoon sergeant testified that he conducted the inventory of petitioner's unlocked locker which was located in a room shared by three men. He stated that while standing on a chair he came across a spiral bound notebook on the high top shelf of the locker and that he threw it over onto the bed. He testified that the notebook fell open to a page (marked by a greeting card) on which petitioner had written a letter to a friend. The sergeant further testified that when he finished clearing out the locker, he stood over the bed inspecting a set of keys found in the locker to determine if there were any military vehicle keys on the ring because petitioner had been one of his platoon's drivers. He testified that he glanced at the open notebook and, noticing a racial slur which he did not tolerate in his platoon, he continued reading. He immediately realized that the letter was evidence of the crime for which petitioner had been arrested. The notebook was then placed in evidence and turned over to the Seattle Police Department; eventually it was introduced into evidence at petitioner's trial.

The commanding officer of the company testified that pursuant to standard military procedure, he had ordered the inventory of petitioner's gear and personal effects. He also testified that it would have been appropriate for the person conducting the inventory to ascertain ownership of inventoried items prior to storage, especially in view of the fact that more than one person lived in the room. Petitioner testified at his trial that not all of the writing in the notebook was his and that parts of the notebook were written by his roommates.

The trial court found that the platoon sergeant had followed standard operating procedure in inventorying petitioner's belongings in order to insure their safety. The court also found that the sergeant did not know the notebook belonged to petitioner since there were two other occupants of the room and that he looked at it to determine ownership and because he noticed a racial slur which he did not allow in his unit. The trial court further found that it was

apparent to the sergeant that the letter was evidence of guilt and that he had reported it to his captain who gave it to Seattle police officers. The trial judge concluded there was no unlawful search and seizure and denied the motion to suppress.

At trial, petitioner testified that he had no prior knowledge that his companion was armed or that he intended to engage in a robbery on the day of the killing. The letter was admitted into evidence as showing petitioner's knowledge of his companion's intent to engage in an armed robbery. The murder victim was killed by petitioner's companion during the course of the robbery.

The search and seizure issues were not raised in petitioner's appeal to the Court of Appeals. In 1989, however, petitioner filed a personal restraint petition arguing that the trial court erred in admitting the incriminating letter. The Court of Appeals dismissed the personal restraint petition holding that petitioner's failure to raise the Fourth Amendment issue on direct appeal precluded him from raising it in a personal restraint proceeding. That court further held that petitioner's Fifth Amendment argument was without merit since the inculpatory statements in the letter were voluntary and not compelled and that his Fourteenth Amendment due process and equal protection claims did not identify the claimed error or basis for review.

We accepted a motion for review of the Court of Appeals order and petitioner now has also asserted an ineffective assistance of appellate counsel argument, to be decided in the event we should decline to consider Fourth Amendment issues not raised on direct appeal.

This case presents three issues.

## ISSUES

ISSUE ONE. Did the search of petitioner's locker in his Fort Lewis room by military personnel violate the fourth amendment to the United States Constitution?

ISSUE TWO. Should evidence lawfully obtained under federal standards by federal officers in a federal enclave be

admissible in a state court even if the seizure might have violated state law if conducted by state officials?

ISSUE THREE. Did the introduction into evidence of a letter written by petitioner violate his Fifth Amendment right not to be compelled to testify against himself?

## DECISION

ISSUE ONE.

CONCLUSION. The trial court did not err in refusing to suppress the letter found in petitioner's army locker because it was discovered during the course of a valid inventory search. It follows that introduction of the letter into evidence at his murder trial did not violate the Fourth Amendment.

 Military personnel are entitled to the protection of the Fourth Amendment which will be enforced by the exclusionary rule in civilian and in military courts.[2] However, in military settings there exists the power to intrude into the personal effects of military personnel which would not be allowed in civilian settings.[3] Routine inventory searches conducted by military authorities generally do not violate the Fourth Amendment and if evidence of crime is discovered during the course of a lawful inventory, such evidence is admissible in a subsequent trial.[4] However, if a purported inventory was merely a mask for an otherwise illegal search, the evidence obtained is not admissible.[5] The lawfulness of an inventory search is not affected by the

---

[2]3 W. LaFave, *Search and Seizure* § 10.3(c) (2d ed. 1987); *Search and Seizure—Situations Where the Fourth Amendment Does Not Apply: A Guide for Commanders and Law Enforcement Personnel,* Army Law., June 1988, at 57.

[3]3 LaFave § 10.3(c); *United States v. Middleton,* 10 M.J. 123, 127 (C.M.A. 1981).

[4]*See United States v. Law,* 17 M.J. 229, 236 (C.M.A. 1984); *United States v. Barnett,* 18 M.J. 166, 169 (C.M.A. 1984); *United States v. Dulus,* 16 M.J. 324, 326 (C.M.A. 1983). *See also United States v. Ellis,* 24 M.J. 370, 372 (C.M.A. 1987) (regarding reasonable expectation of privacy during inspections).

[5]*Law,* 17 M.J. at 237.

existence of alternative, less intrusive means for accomplishing the objectives.[6]

The distinction drawn in military settings between a search and an administrative intrusion has been well summarized as follows:

> It is vital to understand that there is an important distinction between a search and an administrative intrusion (inspection or inventory). A search is an intrusion into an area where a soldier has an objectively reasonable expectation of privacy conducted by government officials for the purpose of obtaining *evidence* which can later be used in a *criminal prosecution.* An inspection is also an intrusion into a place where a service member normally entertains an objective, reasonable expectation of privacy, but the *primary purpose* "is to determine and ensure security, military fitness or good order and discipline of the unit . . .".
>
> · . . . the correct application of the appropriate standard will determine the admission or suppression of evidence or contraband discovered during the intrusion.
>
> Theoretically, the military commander can order an inspection or inventory whenever he or she determines it is appropriate. As long as his or her "primary purpose" is to insure the health, welfare, morale, fitness and readiness of the unit, and so long as the scope of the intrusion is reasonable, evidence of crime or contraband discovered as a result can be offered into evidence at courtsmartial.

(Footnotes omitted.) Peluso, *Administrative Intrusions,* Army Law., Sept. 1985, at 25.

█ The interests of orderly military administration require the inventory of the personal effects of an absentee military person.[7] The rationale supporting the routine inventory is twofold: to protect the property of the absentee service person and to protect the government from potential liability claims for the loss of personal property of a member of the service.[8] If proper inventory procedures are followed, even some suspicion that evidence of crime will be

---

[6]*Law,* 17 M.J. at 237; *Illinois v. Lafayette,* 462 U.S. 640, 77 L. Ed. 2d 65, 103 S. Ct. 2605 (1983).

[7]*Dulus,* 16 M.J. at 326.

[8]*United States v. Jasper,* 20 M.J. 112, 115 (C.M.A. 1985); *Barnett,* 18 M.J. at 169.

found will not avoid a finding of an otherwise valid inventory search.[9] The *primary purpose* of the military commander controls in determining whether an administrative intrusion is valid or merely a pretext for a search.[10]

When relying on the inventory exception to the warrant requirement, many cases have attached significance to the existence of and compliance with regulations and standardized procedures for inventories.[11] In the present case, the platoon sergeant testified that he carefully followed standard inventory procedures and was not searching for evidence of crime, but was merely attempting to inventory and store petitioner's possessions.

The commanding officer testified that any time an individual leaves the unit, a routine inventory of the person's property is ordered to protect that individual's possessions. In petitioner's case, the officer explained that he was ordering not a search for evidence of crime, but rather an inventory of both military equipment and personal effects for purposes of storage. The evidence amply supports the conclusion that the commanding officer's primary purpose was not to gather evidence of crime and that the sergeant was conducting a routine lawful inventory with an administrative purpose rather than with a criminal investigatory purpose.

Petitioner argues that the sergeant's reading of the inculpatory letter in the notebook exceeded the scope of a valid inventory search and thereby violated the Fourth Amendment. The State argues that the search was a valid inventory search and that the letter in the notebook was (1) discovered in the course of a proper inspection to determine ownership and/or (2) in plain view during the inventory.

---

[9]*Barnett,* 18 M.J. at 169–70 (citing *Law,* 17 M.J. at 237).

[10]Peluso, *Administrative Intrusions,* Army Law., Sept. 1985, at 24–30.

[11]*South Dakota v. Opperman,* 428 U.S. 364, 375, 49 L. Ed. 2d 1000, 96 S. Ct. 3092 (1976); *Law,* 17 M.J. at 237 and cases cited therein.

Petitioner's argument that the reading of the letter exceeded the scope of an inventory search is not supported by relevant case law under the facts of this case. The sergeant testified that he read the letter in the open notebook while standing over the bed inspecting the keys because he noticed that a racial epithet had been used. He also testified that it was his job during an inventory to determine if the absent service person did in fact own the property before the property was stored.

The search did not exceed the scope of a military inventory. In *United States v. Barnett,* 18 M.J. 166 (C.M.A. 1984), evidence found under a tray in a tool box during an inventory search which was conducted during the soldier's pretrial confinement was held to be admissible evidence. *Barnett* held that the soldier would reasonably have expected that, in the event of pretrial confinement for any appreciable period of time, his property would be inventoried and his room made available for use by others. *Barnett,* 18 M.J. at 170.

In *United States v. Jasper,* 20 M.J. 112 (C.M.A. 1985), the court held that the scope of an inventory search was not exceeded when the person conducting the inventory looked inside an envelope and read the enclosed letter because such action was necessary to establish ownership. *United States v. Law,* 17 M.J. 229 (C.M.A. 1984) held that the reading of a note in a suitcase was a logical and permissible way to identify the suitcase's owner. In *United States v. Dulus,* 16 M.J. 324 (C.M.A. 1984), the court upheld the search of a smoking box inside an on–base automobile belonging to an airman who had been confined pending his trial. In *United States v. Strahan,* 674 F.2d 96 (1st Cir.), *cert. denied,* 456 U.S. 1010, 73 L. Ed. 2d 1306, 102 S. Ct. 2304 (1982), the court held that reading documents on the floor of a van during a valid inventory was permissible in order to establish ownership.[12]

---

[12]*See also Opperman,* 428 U.S. at 374.

■ In the case before us, the incriminating notebook was found in an unlocked locker in a room shared by several men and petitioner later testified that not all of the writing in the notebook was his, but parts were written by his roommates. The reading of the notebook to determine ownership did not exceed the scope of a military inventory search under these circumstances.

■ Hence, the admission of such evidence at trial did not violate the Fourth Amendment. We conclude, as has been done in similar factual settings, that when one conducting a proper inventory is suddenly confronted with evidence of a crime, that person is not bound to close his or her eyes to its character and seal it along with the innocent articles.[13]

In light of our conclusion that the letter was discovered within the scope of a valid military inventory, we need not reach the State's alternative argument that the letter was admissible under the plain view doctrine.

■ Petitioner also argues that a gun admitted into evidence at the murder trial should have been suppressed as the fruit of an illegal search. However, it is unrefuted that the gun was not found in a search by authorities; rather it was turned over to the military by a friend of the petitioner, who had originally secreted it in an attempt to keep petitioner out of trouble. There is no merit to the argument that the gun should have been suppressed for, among other reasons, the exclusionary rule does not apply to the acts of private individuals.[14]

The State argues that this court should always decline to reach a search and seizure issue which is initially raised in a personal restraint petition. The State relies on *Stone v. Powell,* 428 U.S. 465, 49 L. Ed. 2d 1067, 96 S. Ct. 3037

---

[13]*United States v. Law,* 17 M.J. 229, 239 (C.M.A. 1984); *United States v. Kazmierczak,* 16 C.M.A. 594, 37 C.M.R. 214 (1967).

[14]*State v. Smith,* 110 Wn.2d 658, 666, 756 P.2d 722 (1988), (citing *State v. Wolken,* 103 Wn.2d 823, 830, 700 P.2d 319 (1985)), *cert. denied,* 488 U.S. 1042 (1989). *See also State v. Boland,* 115 Wn.2d 571, 800 P.2d 1112 (1990).

(1976) and *In re Rountree*, 35 Wn. App. 557, 668 P.2d 1292 (1983). We decline to reach this question since the issue is not presented in this case.

■ Petitioner has not carried his initial burden of showing any constitutional error whatsoever. As we recently held in the context of constitutional error, a petitioner in a personal restraint petition must satisfy the threshold burden of demonstrating actual and substantial prejudice. *In re Cook*, 114 Wn.2d 802, 810, 792 P.2d 506 (1990). "If a preliminary consideration of the merits evidences sufficient prejudicial constitutional error . . . then petitioner will have established that the error is of the type that should be subject to full collateral review."[15] We did not decide in *Cook* whether a search and seizure violation does, in fact, constitute "actual and substantial prejudice" to a petitioner. This case is similar to *In re Williams*, 111 Wn.2d 353, 364, 759 P.2d 436 (1988) wherein we held:

> It is fundamental in evaluating a personal restraint petition, that "[i]f a petitioner fails to meet the threshold burden of showing actual prejudice arising from constitutional error, the petition must be dismissed". Here, quite aside from the matter of "prejudice", there has been no adequate threshold showing of any constitutional error in the first place.

(Footnotes omitted.)

As we also explained in *In re Sauve*, 103 Wn.2d 322, 325, 692 P.2d 818 (1985), until such time as a petitioner makes a threshold showing that a warrantless search constitutes error, it is not necessary or appropriate to decide whether search and seizure issues may be raised initially in a personal restraint petition.

Petitioner also argues that in the event we decline to consider the search and seizure issues because they were not raised on direct appeal, we should decide whether he was denied effective assistance of counsel during that appeal because of the failure to raise those issues. Because petitioner has failed to carry his initial burden of showing

---

[15]*In re Cook*, 114 Wn.2d 802, 811, 792 P.2d 506 (1990).

any constitutional error whatsoever, we need not consider his ineffective assistance of appellate counsel argument.

ISSUE TWO.

CONCLUSION. Evidence which is lawfully obtained by federal officers pursuant to federal law is admissible in Washington State criminal proceedings even if seizure of evidence in a similar manner by state officials might violate the State of Washington Constitution.

Before even considering whether Const. art. 1, § 7 should be applied in this context to afford greater privacy rights than the Fourth Amendment under a *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) analysis, it is first necessary to ask whether the state constitution applies at all when a federal officer has lawfully obtained evidence pursuant to federal constitutional standards.

██ We have addressed this issue in a closely analogous factual setting. In *State v. Bradley,* 105 Wn.2d 898, 719 P.2d 546 (1986), the defendants argued that the State could not convict on the basis of evidence that federal officials seized in accordance with the federal constitution but in violation of our state constitution.[16] We disagreed and held that Const. art. 1, § 7 does *not* require exclusion of evidence seized by federal officials when the seizure comported with the federal constitution even if the evidence was obtained in violation of the state constitution. We held that "[n]either state law nor the state constitution can control federal officers' conduct."[17] A Court of Appeals decision also recently, and correctly, so held, stating that evidence which is independently and lawfully obtained by federal

---

[16]Our cases regarding illegal wiretaps do not undermine the holding in *State v. Bradley,* 105 Wn.2d 898, 719 P.2d 546 (1986). *Bradley* was decided 6 years after *State v. Williams,* 94 Wn.2d 531, 617 P.2d 1012, 24 A.L.R.4th 1191 (1980). *Williams* had held that Washington's privacy statute required exclusion of evidence which was lawfully obtained by federal officers under federal wiretap law in Washington. *Williams* is distinguishable from *Bradley* (and the present case) because it was based upon the *statutory* language in the privacy act and did not rely on the state constitution for its rationale.

[17]*Bradley,* 105 Wn.2d at 902–03.

officers acting pursuant to federal law may be transferred to state authorities for use in a Washington State criminal proceeding.[18]

We explained in *Bradley*[19] that for purposes of search and seizure law, a border search by federal officials is analogous to a search conducted in a different jurisdiction. The present case presents an even stronger argument for the admissibility of this evidence than did *Bradley* since the inventory search in this case occurred in a federal enclave. Fort Lewis is an area of exclusive federal jurisdiction ceded to the United States government by the State of Washington.[20] A search by federal officers in a federal enclave, which search comports with federal law, is an even closer analogy to a search conducted in a different state jurisdiction than was present in the *Bradley* case.

A number of cases in other states have considered interjurisdictional transfer of evidence and reached the same result as we did in *Bradley*.[21] In *State v. Mollica*, 114 N.J.

---

[18]*State v. Gwinner*, 59 Wn. App. 119, 796 P.2d 728 (1990).

[19]*Bradley*, 105 Wn.2d at 902.

[20]*State v. Lane*, 112 Wn.2d 464, 469–70, 771 P.2d 1150 (1989).

[21]*Pooley v. State*, 705 P.2d 1293 (Alaska Ct. App. 1985) (no need to determine the scope of the Alaska constitution's protection in this area because the Alaska constitution was not implicated); *Daniels v. State*, 534 So. 2d 628 (Ala. Crim. App. 1985) (evidence stemming from warrantless arrest in Texas is not excluded in an Alabama criminal prosecution even if the arrest was improper under Texas laws so long as the arrest was proper under the Fourth Amendment), *aff'd*, 534 So. 2d 656, *cert. denied*, 479 U.S. 1040, 93 L. Ed. 2d 850, 107 S. Ct. 898 (1987); *McClellan v. State*, 359 So. 2d 869 (Fla. Dist. Ct. App. 1978) (evidence procured in a sister state pursuant to a search valid under the laws of that state is admissible in a criminal trial in Florida notwithstanding that the warrant would not have been valid under Florida law so long as the seizure does not offend the United States Constitution), *cert. denied*, 364 So. 2d 892 (1978); *People v. Phillips*, 41 Cal. 3d 29, 711 P.2d 423, 222 Cal. Rptr. 127 (1985) (neither the deterrent purpose of the exclusionary rule, nor the preservation of judicial integrity purpose is served by exclusion in a California criminal trial of evidence seized by another jurisdiction pursuant to its law so long as it was lawful under federal law even though seizure would have violated the California constitution if engaged in by California officials). *State v. Dreibelbis*, 147 Vt. 98, 511 A.2d 307 (1986) (evidence

329, 554 A.2d 1315 (1989), a federal officer acting within the state obtained evidence in a manner which did not violate the federal constitution or law, but which if obtained by a state officer would have violated the state constitution. The issue addressed was whether, after the federal officer gave the evidence to state authorities, suppression in state court was required. The court in *Mollica* concluded that the federal officer's in–state seizure was lawful notwithstanding any potential dictates of the state constitution.

> Because the constitution of a state has inherent jurisdictional limitations and can provide broader protections than found in the United States Constitution or the constitutions of other states, the application of the state constitution to the officers of another jurisdiction would disserve the principles of federalism and comity, without properly advancing legitimate state interests. Such considerations also serve in large measure to explain why it does not offend the constitutional principles of a forum jurisdiction to allow the transfer of criminal evidence from the officers of another jurisdiction to those of the forum when the evidence has been obtained lawfully by the former without any assistance by the latter.

*Mollica,* 114 N.J. at 353. After a lengthy discussion of the rationale behind this doctrine, the *Mollica* court concluded that: "*[s]tated simply, state constitutions do not control federal action.*" (Italics ours.)[22] An important caveat to *Mollica* is that the federal officer must not have been acting as an agent for the state at the time the officer acquired the evidence.[23] There is no evidence in the present case that the military authorities were in fact acting as agents for the State of Washington.

■ Petitioner further argues that even if the Army officials lawfully obtained the letter, the State of Washington needed a warrant in order to accept the evidence from the military authorities. We disagree. Once evidence is legally

---

seized in a routine border inspection met federal standards and was admissible in state prosecution even though federal officials were not held to probable cause standards of state police).

[22]*State v. Mollica,* 114 N.J. 329, 352, 554 A.2d 1315, 1327 (1989).

[23]*Mollica,* 554 A.2d at 1329. *See also Gwinner,* 59 Wn. App. at 125.

seized by one law enforcement agency, there is no bar to a transfer of the evidence to another such agency and a warrant is not necessary for such a transfer.[24]

■ Thus, we decline petitioner's invitation to engage in a state constitutional analysis of the locker search, since the State of Washington Constitution is not implicated under these facts. As the New Jersey Supreme Court observed in *Mollica,* a state constitution ordinarily governs only the conduct of the state's own agents or those acting under color of state law.[25]

In *Alverado v. WPPSS,* 111 Wn.2d 424, 759 P.2d 427 (1988), *cert. denied,* 490 U.S. 1004, 104 L. Ed. 2d 153, 109 S. Ct. 1637 (1989), the plaintiffs argued that a drug screening program for job applicants at nuclear power facilities was violative of Const. art. 1, § 7. We there held that the constitutional principle of federal preemption precluded the application of the state constitution. In *Alverado,* we held that the doctrine of preemption renders the state constitution irrelevant and that the case must be decided on Fourth Amendment grounds alone. We, therefore, did *not* engage in a *Gunwall*[26] balancing analysis since the state constitution did not apply in that situation. This case is analogous in that we have previously held that searches conducted by federal officers pursuant to federal law are admissible in Washington courts notwithstanding the dictates of our state constitution.[27] A *Gunwall* balancing

---

[24]*United States v. Lester,* 647 F.2d 869, 875 (8th Cir. 1981); *Mollica,* 554 A.2d at 1328; 1 W. LaFave, *Search and Seizure* § 1.6, at 119 (2d ed. 1987); *State v. Bell,* 108 Wn.2d 193, 200–01, 737 P.2d 254 (1987) (no warrant is needed because the defendant no longer has a reasonable expectation of privacy); *Gullet v. United States,* 387 F.2d 307, 308 n.1 (8th Cir. 1967), *cert. denied,* 390 U.S. 1044, 20 L. Ed. 2d 307, 88 S. Ct. 1645 (1968).

[25]*Mollica,* 554 A.2d at 1324.

[26]*State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

[27]*State v. Bradley,* 105 Wn.2d 898, 719 P.2d 546 (1986).

analysis is, therefore, neither necessary nor advisable in this case.

ISSUE THREE.

CONCLUSION. The introduction into evidence at the murder trial of the letter written by petitioner did not violate his Fifth Amendment right not to be compelled to testify against himself since his writing of the letter was entirely voluntary.

 Petitioner argues that he was compelled to give testimony against himself in violation of his privilege against self–incrimination when the court admitted the letter he had written to his friend prior to his arrest. That is incorrect. *Andresen v. Maryland*, 427 U.S. 463, 49 L. Ed. 2d 627, 96 S. Ct. 2737 (1976) holds that the Fifth Amendment does not protect against a search and seizure of private papers containing incriminating statements made by an accused.[28] The constitution does not forbid all self–incrimination; it does forbid the use of involuntary statements made by, and used against, a defendant.[29] There is no allegation that statements made in petitioner's letter to his friend were involuntary. Petitioner's Fifth Amendment argument is without merit.

 Petitioner also alleges that he was denied due process and equal protection. We agree with the Court of Appeals that petitioner has not adequately identified the claimed error or the basis for relief with regard to these issues. As previously noted, we have repeatedly held that when a personal restraint petition relies solely on conclusory allegations, courts should decline to determine the validity of such issues.[30] We so decline in this case.

---

[28]*See also State v. Johnston*, 27 Wn. App. 73, 75, 615 P.2d 534 (1980).

[29]*State v. Dictado*, 102 Wn.2d 277, 293, 687 P.2d 172 (1984).

[30]*In re Williams*, 111 Wn.2d 353, 364, 759 P.2d 436 (1988); *In re Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990).

The Court of Appeals order dismissing petitioner's personal restraint petition is affirmed.

DORE, C.J., UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.