[Nos. 15611-3-II; 15648-2-II.   Division Two.   September 7, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. BRYAN WILSON COTTEN, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. LOUIS MICHAEL BALDASSARI, *Appellant.*

670

Thomas A. Campbell; Monte E. Hester and Law Offices of Monte E. Hester, Inc., P.S., for appellant Cotten (appointed counsel for appeal).

*Robert M. Quillian* and *Thomas E. Doyle,* for appellant Baldassari (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney,* and *Chris Quinn-Brintnall, Senior Appellate Deputy,* for respondent.

ALEXANDER, J. — Bryan Wilson Cotten appeals his convictions of one count of first degree murder and one count of second degree assault. He contends that the trial court erred in: (1) denying his motion to suppress a shotgun seized from the house of his codefendant, Louis Baldassari; (2) denying his motion to sever the second degree assault charge from the charge of first degree murder; (3) denying his motion to sever his trial from that of Baldassari; (4) admitting hearsay evidence; and (5) denying his motion to dismiss the second degree assault charge for what he claims was the State's destruction of possibly exculpatory evidence. Cotten also asserts that there was insufficient evidence to support the jury's verdict and that he should have received an additional 15 days' credit against his sentence for time he served while being held by federal authorities.

Louis Michael Baldassari, who was tried jointly with Cotten, also appeals his convictions on charges of first degree murder and second degree assault, contending that the trial court erred in denying his motion to suppress the shotgun seized from his house. We affirm both Defendants' convictions.[1]

During the early morning hours of July 9, 1990, Wenard Wilson, Lemonne Lewis, and Kenneth Scott Hawkins were standing together near the corner of 16th Street and South "L" Street in the "Hilltop" area of Tacoma. At that time, a black automobile was driven around the block, passing the group of men several times. On its final pass, the lights on the car were turned off as it approached Wilson, Lewis, and Hawkins. As the car came near to them, Lewis and Hawkins saw the barrel of a shotgun emerge from a passenger window of the car. Several rounds were fired from the shotgun,

---

[1]Cotten's and Baldassari's appeals were consolidated by order of this court.

and Wilson was struck twice in the head. He was then taken to a hospital, where he later died.

Tacoma Police Officer Quilio soon arrived at the scene of the shooting in order to conduct an investigation. He discovered a spent shotgun shell on the street approximately 75 feet from where Wilson's body had fallen. The size of the shell casing was identified as "12 gauge, .00 buck" containing nine pellets. Officer Quilio spoke with Lewis and Hawkins, who each described the car from which the shot had been fired as a black 2-door 1970's Chevrolet Malibu with red pinstriping. They also gave vague descriptions of the driver of the car and a passenger.[2]

Approximately 1 week later, Louis Baldassari, Bryan Cotten, John Drummond, and Darren Williams met at Drummond's house and decided to go to the Narrows Plaza.[3] Williams was driving what he later said was a "white . . . Jeep Cherokee" that he had stolen several weeks earlier. Cotten was driving his own car, a black 2-door Chevrolet Malibu. The four men discovered that the Narrows Plaza was closed, so they decided to leave Cotten's car parked on a street and "drive around" in the stolen Jeep. As they were driving in Lakewood, Cotten suggested, "[l]et's go to the [H]illtop and shoot niggers". Baldassari added that it would be "ideal" because they were "traveling in a stolen car" that could not be traced. According to Williams, Cotten and Baldassari then began talking "about an incident where they went to the [H]illtop and killed someone". Baldassari, describing the prior incident, said that he saw someone on the Hilltop, shot him, and that he "blew his head clean off" with "[a] shotgun, a 00 buckshot". Cotten then added, "Oh, I didn't get one." According to Williams, both Cotten and Baldassari expressed their dislike of what they described as "dope-peddling niggers". They both indicated that "there was a real

---

[2]Hawkins thought that two of the occupants in the vehicle were white, and that one, the passenger, had dark hair. Lewis thought that the driver had blond or brown hair and that the passenger was wearing a baseball cap.

[3]Williams indicated that this get-together took place "around" July 20, 1990, but that the exact date could be "anywhere ten days from that day".

rush involved, and that it was just real exciting and tense". Baldassari and Cotten both told Williams that Cotten was driving the car and Baldassari had shot the person through the passenger side.

The four men then drove to Cotten's house in Lakewood so that Cotten could get his shotgun. After they left Cotten's house with the shotgun, they drove around the Lakewood area, committing various acts of vandalism. As they traveled over the Lake Steilacoom Bridge, Williams noticed that a car had pulled up behind them. With encouragement from Drummond and Baldassari, Cotten picked up his shotgun and fired five or six shots at the trailing car from the back window of the Jeep. The four men later abandoned the Jeep near the Oakbrook Golf and Country Club, causing it to roll over the side of a hill into a tree.

In the early morning of July 15, Pierce County Deputy Sheriff Wescott responded to a report that someone had fired shots at a car. He arrived at a service station on Steilacoom Boulevard and spoke with Mark Lee Jacobson, who claimed that he was the victim of a shooting. Jacobson indicated that when he pulled up behind a car on the Lake Steilacoom Bridge, several shotgun blasts were fired at his car. Jacobson said that he tried to give chase to his assailants, but eventually gave up. He identified the vehicle that the shots came from as some kind of 4-wheel drive vehicle, "like a newer Bronco or Blazer, Jeep. . . . they all look kind of the same".

That same morning, Pierce County Deputy Sheriff Becinski, who was working off duty as a security officer for the Oakbrook Golf and Country Club, discovered a "Jeep Wagoneer", which he described as "[b]lack" in color, wrecked and abandoned on an embankment near the golf course. He observed that the back window of the Jeep was shattered, and he detected the odor of gunpowder emanating from within the vehicle. Deputy Becinski, who had been in contact with Deputy Wescott, found several "expended 12 gauge shotgun rounds" in the Jeep. He threw the shells away, because he was under the impression that the crime being investigated involved a shooting of an empty vehicle.

About 1 week later, Williams and Baldassari visited the home of Edward Harris, a friend of Williams. Harris had apparently heard rumors that Baldassari was involved in a shooting in the Hilltop area. Consequently, Harris confronted Baldassari about the rumor. Baldassari responded that he had shot someone in self-defense. Williams, who was nearby, overheard some of this conversation between Harris and Baldassari.

At some point after July of 1990, Cotten and Baldassari got together at Cotten's house with a friend, Michael LeVasseur. On that occasion, Cotten began telling LeVasseur about having shot someone. Cotten told him that he and Baldassari had been "driving around up on the Hilltop in Bryan's car" when someone approached the car. Cotten indicated that Baldassari then rolled down the window, grabbed a shotgun, and fired at the person. Cotten told LeVasseur that he saw something "like a hat fly off and then they drove off". During Cotten's recitation of this story, Baldassari, who was eating, did not speak. He did, however, nod affirmatively.

On another occasion Cotten told LeVasseur about an incident where he shot at a car that was trailing a car in which he was a passenger. Cotten told LeVasseur that he had fired his shotgun through the back window, hitting the trailing car's radiator, and that the car in which he had been riding was "dumped" near the Oakbrook Golf and Country Club.

On November 12, 1990, several FBI agents went to the Tacoma home of Barbara Baldassari, Louis Baldassari's mother. The residence was also the home of Louis Baldassari. The agents informed Barbara Baldassari that her son had been arrested for his suspected involvement in a bombing incident that had occurred the previous day at McChord Air Force Base. They said that they wanted to obtain her consent to search for evidence connected to the bombing. Barbara Baldassari signed a federal consent to search form, which provided that the FBI agents could "conduct a complete search" of the premises and remove "any letters, papers, materials or other property which they may desire".

The agents advised Barbara Baldassari that they intended to limit their search to the garage and Louis Baldassari's room, and that they were only looking for "materials which could be used to make bombs".

While FBI agent Bickers was searching Louis Baldassari's upstairs bedroom, he observed the stock of a shotgun protruding from the covers of Baldassari's bed, wedged between the bed and the wall. He picked up the weapon and determined that it was loaded. Bickers immediately unloaded it, and took it to Barbara Baldassari, who had remained somewhere downstairs.[4] The FBI agents asked Barbara Baldassari if they could take the weapon into their possession. She replied that they could do so. After holding the shotgun for 1 week, the FBI released it to the Tacoma Police Department.[5]

The State charged Cotten and Baldassari with first degree murder and second degree assault.[6] Before trial, both Defendants moved to suppress the shotgun seized at Baldassari's residence. At a suppression hearing, two of the FBI agents who had participated in the search testified, as did Barbara Baldassari and her nephew.[7] The trial court denied the suppression motions, concluding that the FBI agents had Barbara Baldassari's consent to search Louis Baldassari's bedroom, and that after the agents found the shotgun, Barbara Baldassari further consented to its removal, thus expanding

[4]The shotgun was identified at trial as Baldassari's Mossburg 500, pump, 12-gauge shotgun.

[5]At some point in October, Darren Williams was interviewed by the Tacoma Police Department. As a result of that interview, the department became aware of a connection between Wilson's death and Louis Baldassari.

[6]RCW 9A.32.030(1)(a) provides:
"A person is guilty of murder in the first degree when:
"(a) With a premeditated intent to cause the death of another person, he or she causes the death of such person . . .".
RCW 9A.36.021(1)(c) provides:
"A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:
". . . .
"(c) Assaults another with a deadly weapon . . .".

[7]Barbara Baldassari's nephew, Richard Marterella, had arrived at Baldassari's house soon after the FBI agents began their search.

the scope of the consensual search. The trial court concluded that the agents acted "appropriately" in unloading the shotgun and in asking Barbara Baldassari about the weapon. It further concluded that at no time did the removal of the shotgun rise to the level of a "seizure".

Cotten and Baldassari each moved to sever the assault charge from the murder charge. The trial court denied their motions.

At trial, the State presented testimony consistent with the facts set forth above. In addition, an automobile dealer testified that in early 1991, he purchased a 2-door black Chevrolet Malibu with gold pinstriping from Cotten. Over objection from defense counsel, the State introduced Baldassari's shotgun into evidence. A state forensic scientist who tested the spent shell discovered at the scene where Wilson was shot testified that there was a "straightforward" match between the shell found at the scene and those fired from Baldassari's shotgun.

Travis Hardesty, a friend of Baldassari, also testified for the State, over defense objection, about statements Baldassari had made to him about a shooting in the Hilltop area. Hardesty indicated that Baldassari had driven him to that area, pointed down a street and said, "That's where I gauged that nigger".

Neither Cotten nor Baldassari testified. The defense presented only one witness, Raymond Davis, a forensic scientist, who testified that the shotgun shell found at the Hilltop shooting scene could not be positively linked to Baldassari's shotgun. Davis indicated, however, that Baldassari's shotgun could not be excluded as the weapon that had fired the shell.

During trial, the defense made several additional motions, including one to have Cotten's and Baldassari's trials severed because of the out-of-court statements of Cotten and Baldassari that were admitted through the testimony of Williams and others. They also moved to dismiss the assault charge because of the destruction of the shotgun shells found

in the Jeep. These motions were denied. A jury found each Defendant guilty on both charges.

## I

### BALDASSARI'S APPEAL

Baldassari contends that the trial court erred in denying his motion to suppress the shotgun found at his home. He argues that its seizure ran afoul of the Fourth Amendment because it was without a warrant, beyond the scope of consent provided by Barbara Baldassari, and performed under the pretext of an investigation into an unrelated federal crime.[8] The State responds that the United States Constitution is not implicated because the shotgun was not "seized" and, even if it had been, its seizure was reasonable or with consent.

The fourth amendment to the United States Constitution provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .". A warrantless search or seizure carried out in a private dwelling is presumptively unreasonable. *Welsh v. Wisconsin*, 466 U.S. 740, 748-49, 80 L. Ed. 2d 732, 104 S. Ct. 2091 (1984); *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *State v. Smith*, 119 Wn.2d 675, 678, 835 P.2d 1025 (1992). "[V]arious elements, of course, . . . can make a search of a person's house 'reasonable' ". *Illinois v. Rodriguez*, 497 U.S. 177, 183-84, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990). One such instance is when "voluntary con-

---

[8]Although Baldassari also argues that the admission of the shotgun was violative of article 1, section 7 of our state constitution, provisions of the Washington State Constitution do not apply here. Evidence that is lawfully obtained by federal officers pursuant to federal law is admissible in Washington criminal proceedings even if the seizure of that evidence in a similar manner by state officers might violate the Washington State Constitution, unless state officials were giving cooperation and assistance to the federal officers. *In re Teddington*, 116 Wn.2d 761, 772, 808 P.2d 156 (1991); *State v. Gwinner*, 59 Wn. App. 119, 124-25, 796 P.2d 728 (1990), *review denied*, 117 Wn.2d 1004 (1991). There is no suggestion here that state officers assisted federal officers in the search or the investigation into the bombing. Furthermore, Baldassari did not discuss the required *Gunwall* factors in his brief. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

sent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises". (Citations omitted.) *Rodriguez*, 497 U.S. at 181; *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973).

Baldassari concedes that FBI agents obtained Barbara Baldassari's voluntary consent to search his bedroom for evidence relating to the bombing at McChord Air Force Base. *See United States v. Matlock*, 415 U.S. 164, 171, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974) (consent to search can be given by person possessing common authority over premises). He argues, however, that the search of his bedroom was a pretext search, the search for the bombing evidence merely being an excuse to search for evidence related to Wilson's death. This claim is unfounded. Although agent Wilkinson, who was in charge of the FBI investigation into the McChord bombing but not present at the search, admitted that he was aware, at the time of the search, of Baldassari's possible involvement in the Hilltop shooting, there is no evidence that Wilkinson informed the agents who performed the search of this fact or that he instructed them to look for a shotgun. Indeed, FBI agent Dean, who was present when the search was performed, testified at the suppression hearing that he was unaware that the shotgun had any evidentiary value and did not become aware of Baldassari's involvement in the Hilltop shooting until more than 1 week after the search.

■ Baldassari's primary contention is that the FBI agents' alleged seizure of Baldassari's shotgun was beyond the scope of Barbara Baldassari's initial consent to search and thus violated the Fourth Amendment. When law enforcement officers are relying on consent as a basis to conduct a warrantless search or effect a warrantless seizure, they have only the authority that has been granted to them by the consent. 3 Wayne R. LaFave, *Search and Seizure* § 8.1(c), at 160 (2d ed. 1987). Any "express or implied limitations or qualifications" may reduce the scope of consent in duration, area, or intensity. 3 LaFave § 8.1(c), at 160; *cf. Florida v. Jimeno*, 500 U.S. 248, 251, 114 L. Ed. 2d 297, 111 S. Ct. 1801, 1803 (1991) (scope

of consent should be measured by "objective reasonableness"). Exceeding the scope of consent is equivalent to exceeding the scope of a search warrant.

When the FBI agents arrived at the residence of Barbara Baldassari, they informed her that her son Louis Baldassari had been arrested for his involvement in a bombing at McChord Air Force Base, and they requested her "consent to look through her house for any evidence of [that] bombing[]." As noted above, Barbara Baldassari signed a "standard F.B.I. form used for consent searches", which provided, in broad language, that agents could search and seize a wide variety of items. Notwithstanding the language of the agreement, the consent to search and seize was clearly more limited. That is so because of the oral agreement between Barbara Baldassari and the FBI agents that the agents would search for, and presumably seize, only evidence relating to the McChord bombing. We conclude, after examining these facts, that Barbara Baldassari's initial consent to search and seize did not cover the shotgun. Significantly, the conduct of the FBI agents supports this conclusion. Following their discovery of the shotgun, the agents sought Barbara Baldassari's consent to take it.

## A

### Was the Shotgun Seized?

Having concluded that the taking of the shotgun was not pursuant to Barbara Baldassari's initial consent, we must next determine if the shotgun was seized by the FBI agents. If the shotgun was not seized, then the Fourth Amendment, which prohibits only unreasonable searches and seizures, is not implicated.

■ A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984); *Segura v. United States*, 468 U.S. 796, 822, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984); *United States v. Place*, 462 U.S. 696, 707-08, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). The United

States Supreme Court has also determined that an item of property is seized when a law enforcement officer exercises "dominion and control" over it. *Jacobsen*, 466 U.S. at 120. In light of these definitions, we proceed to examine the facts of some similar cases where seizures of weapons have been discussed.

In *Coolidge v. New Hampshire*, 403 U.S. at 487-91, the Court determined that no seizure occurred when the defendant's wife voluntarily turned over to the police several guns owned by her husband. The State contends that *Coolidge* and this case are analogous because Barbara Baldassari voluntarily consented to the FBI agents' removal of the shotgun from the house. The *Coolidge* case is not, however, entirely on point. In that case the authorities asked the wife if her "husband owned any guns". *Coolidge*, 403 U.S. at 486. She said yes, produced the guns and turned them over to the authorities. Here, the FBI agents took the shotgun into their physical possession and brought it to Barbara Baldassari prior to seeking her consent to its removal from the home. Although the difference between our facts and those in *Coolidge* may be slight, it is apparent that the FBI agents exercised dominion and control over the shotgun, albeit briefly, before they obtained Barbara Baldassari's consent to remove it from the home.

A case that is more closely analogous from a factual standpoint is *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973), *cert. denied*, 414 U.S. 1158 (1974). In *Gray*, the Sixth Circuit held that when an officer removed some rifles from a closet, carried them to a lower floor of a building and copied down the serial numbers, the officer had seized the rifles, even though the officer never removed the rifles from the house. 484 F.2d at 356. In that case, the officer had been conducting a valid search and observed the rifles in plain view. The officer, however, had no reason to suspect that the rifles had evidentiary value, and, therefore, it was determined that he had no valid reason to seize them. *Gray*, 484 F.2d at 356. Our Supreme Court has quoted *Gray* with approval; "*[r]emoving the rifles from the closet was a seizure*

*as was the copying down of the serial numbers."*[9] *State v. Murray,* 84 Wn.2d 527, 536, 527 P.2d 1303 (1974) (quoting *Gray,* 484 F.2d at 356), *cert. denied,* 421 U.S. 1004 (1975).

■ We believe the facts of this case are closer to *Gray* than they are to *Coolidge.* Not only did the FBI agents in this case remove the shotgun from Baldassari's room without consent, but they unloaded the weapon as well. We conclude, therefore, that when the agents took the shotgun from its location in the bedroom, unloaded it, and carried it out of Baldassari's room, they "seized" the weapon by meaningfully interfering with Baldassari's possessory interests and by asserting dominion and control over the shotgun, even though that control was temporary.[10]

## B
## Was the Seizure Reasonable?

Having determined that, at the point Bickers picked up the shotgun from its resting place near the bed, unloaded it, and took it from the room, the weapon had been "seized" within the meaning of the Fourth Amendment, we must next consider if the seizure was reasonable. Reasonableness has been described as the "touchstone" of the Fourth Amendment. *Jimeno,* 500 U.S. at 250. The Supreme Court has observed that the "essential purpose" of the Fourth Amendment was to impose a standard of reasonableness of the exercise of discretion by government officers. *Delaware*

---

[9]We recognize that the United States Supreme Court has disapproved of the proposition that "mere recording of the serial numbers" of an item of property constitutes a seizure. *Arizona v. Hicks,* 480 U.S. 321, 324, 94 L. Ed. 2d 347, 107 S. Ct. 1149 (1987). That does not, however, alter the holding in *Gray* that a law enforcement officer can meaningfully interfere with possessory interests and thus seize property by transferring it from one part of a building to another.

[10]Our conclusion should not be read so as to inhibit police officers who are performing a valid consent search pursuant to limitations from touching any items that are not suspected of involvement in criminal activity. There is a vast qualitative difference, for purposes of determining when "seizure" has occurred, between touching, moving slightly, or perhaps even picking up various items in order to search for evidence, and the actions of Bickers here. *But see Hicks,* 480 U.S. at 325 (slight movement of item of property can, under some circumstances, constitute a search). Here, the gun was not picked up to gain access to something else. Rather, it was the object of Bickers' action at that point in that it was examined, unloaded, and taken from the room.

*v. Prouse*, 440 U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979).

At the outset, we note that the seizure of the shotgun is not supported by the "plain view" doctrine, in that it was not immediately apparent to the FBI agents that the shotgun was evidence of any crime. *Horton v. California*, 496 U.S. 128, 141, 110 L. Ed. 2d 112, 110 S. Ct. 2301, 2310 (1990) (discussing requirements of plain view seizure). Indeed, the State has not asserted that Bickers had probable cause or any suspicion at all that the shotgun was evidence of a crime. This is not surprising in light of Bickers' concession that the FBI agents were looking for evidence related to a bombing and had no knowledge at the time of the search that Baldassari was a suspect in a murder investigation.

The lack of probable cause does not, however, necessarily invalidate the seizure. Searches or seizures have often been considered reasonable even in the absence of an individualized showing of probable cause. For instance, in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the Supreme Court upheld a police officer's right to briefly stop and frisk a suspect to search for weapons because the officers had reasonable suspicion that the person was armed and dangerous. *See also Place*, 462 U.S. at 702 (applying *Terry* principles to brief seizures of property); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975) (officer may briefly stop vehicle at national border if officer suspects that vehicle may contain alien illegally in country); *cf. United States v. Robinson*, 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973) (search incident to arrest).

The case we find most persuasive is *Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981). In that case, the Court permitted law enforcement officers who were conducting a search in a residence to briefly detain occupants in order to "minimiz[e] the risk of harm to the officers". *Summers*, 452 U.S. at 702. After analyzing both the "character of the official intrusion and its justification", *Summers*, 452 U.S. at 701, the Court determined that

a brief detention was a reasonable one within the Fourth Amendment. *Summers*, 452 U.S. at 699.[11]

■ Consistent with the above authority, we conclude that an officer conducting a search pursuant to consent has the authority to briefly seize any dangerous weapons or instrumentalities that he or she may come across, to secure them by removing ammunition or otherwise rendering the weapon temporarily unusable, and to keep the weapon with him or her while conducting the search.[12] We are quick to point out that our holding is not meant to clothe the officer with authority to remove the weapon from the house. Rather, the seizure must be brief and is limited to ensuring that officers are able to protect themselves while in the residence. The character of their intrusion is limited and the justification is strong. A brief seizure of a weapon in such circumstance is *not* for evidence gathering purposes, but rather for purposes of protecting the searching officer's safety. In this manner, our holding is quite analogous to *Summers* where the brief detention of occupants of a residence that was being searched was held to be permissible, notwithstanding a lack of evidence that the persons being detained presented a risk of harm.[13]

Here, Bickers acted reasonably in securing the shotgun to ensure the safety of all the officers who were conducting the consensual search. He had been made aware that Baldassari was suspected of being involved in a crime of violence — a bombing. Furthermore, it was reasonable for Bickers and the other agents to assume that other persons might be able

---

[11]Although the brief seizure of the occupants in that case occurred pursuant to a search warrant, the Court noted that that fact did not preclude the possible application of the doctrine to other types of searches if the situation warranted. *Summers*, 452 U.S. at 703 n.17.

[12]Although we perceive no reason that this doctrine should not be applied to other types of searches, we need not address that at this time.

[13]Indeed, the situation here is even more compelling than *Summers* because the searching FBI agents were confronted with the presence of a deadly weapon. In *Summers*, the detention was upheld on grounds that the occupants of the searched premises might pose a danger to the searching officers. Here, the possible danger was readily apparent, and a brief seizure of the weapon is entirely reasonable.

to gain access to the home as it was being searched and that such persons could use any weapons located therein. In short, Bickers was justified in briefly seizing the weapon and in taking the shotgun to Barbara Baldassari, who was then asked if the officers could take the weapon from the house. Her consent to their request then expanded the scope of her earlier consent. Assuming that Barbara Baldassari had the power to consent, at that point, the justification for the seizure of the shotgun changed from officer safety to a consensual seizure, which would justify removal of the shotgun from the house.

## C

### Barbara Baldassari's Power To Consent to Seizure

Baldassari asserts, additionally, that even if the FBI agents acted reasonably in initially seizing the weapon within the house, they violated the Fourth Amendment by removing the weapon from the home. He bases this argument on his contention that his mother, Barbara Baldassari, was without authority to consent to the removal of property that was owned by him and was not, at that time, suspected as being evidence of any crime. We disagree.

■ It is clear that persons who do not own an item of property, but who maintain common authority over the residence in which the property is located, can consent to the seizure and removal of the item from the premises by law enforcement officers if the item is suspected to be evidence of a crime. *See Coolidge.* We cannot conceive of any reason for there to be a different rule when the authorities do not suspect that an item is evidence of a crime as long as someone who the officers reasonably believe has common authority over the premises consents to the seizure of the item. Here, the search was being conducted in Barbara Baldassari's home, and she manifested her desire to have the shotgun removed from that home. In our judgment, Barbara Baldassari validly consented to the seizure and removal of the weapon from a house over which she had authority.

## II

### Cotten's Appeal

#### A

#### Motion To Suppress/Standing

Cotten contends that he should have been accorded standing to contest the introduction of the shotgun. We are dubious that someone who does not own the item seized, does not own or live in the place searched, was not present when the item was seized, and has no reasonable expectation of privacy in the place that is being searched can assert standing to contest the admission of that item under any concept of standing recognized by state or federal law. *See Rakas v. Illinois*, 439 U.S. 128, 142-50, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978); *United States v. Taketa*, 923 F.2d 665, 671-72 (9th Cir. 1991); *State v. Zakel*, 119 Wn.2d 563, 570-71, 834 P.2d 1046 (1992). Nevertheless, in light of our conclusion that the trial court did not err in admitting the shotgun into evidence at trial, we need not decide whether Cotten had standing to contest the admission of the shotgun into evidence.

#### B

#### Severance of the Charges

Cotten contends that the trial court erred in denying his motion to sever the charge of first degree murder from the second degree assault charge. He asserts that the two charges were not connected in time or place, involved different parties, and were committed under different circumstances.

CrR 4.4(b) provides that the trial court shall grant a severance motion if it determines "that severance will promote a fair determination of the defendant's guilt or innocence of each offense". A defendant seeking severance has the burden of demonstrating that a trial of the counts together would be manifestly prejudicial such that it would outweigh any concern for judicial economy. *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990). A trial court's refusal to sever counts under CrR 4.4(b) is reviewed for manifest abuse of discretion, and the defendant has the bur-

den of demonstrating that abuse on appeal. *State v. Watkins*, 53 Wn. App. 264, 269, 766 P.2d 484 (1989).

■ Factors that tend to mitigate any prejudice from a joinder of counts include: (1) the strength of the State's evidence on each of the counts; (2) the clarity of the defenses on each count; (3) the propriety of the trial court's instruction to the jury regarding the consideration of evidence of each count separately; and (4) the admissibility of the evidence of the other crime. *Watkins*, 53 Wn. App. at 269; *State v. Gatalski*, 40 Wn. App. 601, 606-07, 699 P.2d 804, *review denied*, 104 Wn.2d 1019 (1985). These same factors are applied by reviewing courts to determine if a trial court's denial of a severance motion was unduly prejudicial. *State v. Eastabrook*, 58 Wn. App. 805, 812, 795 P.2d 151, *review denied*, 115 Wn.2d 1031 (1990).

Cotten argues that each of the four factors support his claim of prejudice. He contends that the evidence against him was stronger on the assault charge than it was on the murder charge. The jury, he asserts, might have concluded from the strength of the State's assault case that Cotten had a criminal disposition and was more likely to have committed the murder. He points to the absence of a witness identifying him as the driver of the car at the murder scene, and inconsistencies in statements of eyewitnesses regarding the color of the driver's hair and the markings on the vehicle. We disagree. In our judgment, there was strong evidence on each of the counts. As noted above, the State had several witnesses who testified to statements by Cotten and to statements by Baldassari that were adopted by Cotten, to the effect that Cotten was an accomplice to the murder and committed the assault.

Cotten asserts that his defense to the murder charge was that identity had not been proved, and that his defense to the assault charge was to question the recollection of Williams, a coparticipant. Again, we disagree. Cotten defended against both charges by asserting that there was unproved identity and by attacking the credibility of the State's witnesses. The joinder of the charges did not affect Cotten's ability to make his defenses clear to the jury.

Cotten contends, additionally, that the trial court's limiting instruction to the jury failed to ameliorate any prejudice that may have resulted from joinder of the charges, and that evidence on each count would not have been admissible had the two counts been tried separately. We are satisfied that the trial court's instruction to the jury[14] was sufficient to eliminate any prejudice. Furthermore, much of the evidence, including the testimony of LeVasseur and Williams, would have been admissible as to both charges, even if the charges had been tried separately. The trial court did not abuse its discretion in denying the motion to sever the charges.

## C
### Codefendant Out-of-Court Statements

Cotten contends that the trial court erred in allowing various witnesses to testify regarding out-of-court statements made by Baldassari. Cotten asserts that the statements were inadmissible hearsay and that the admission of these statements violated his rights under the confrontation clause.[15]

Two different categories of out-of-court statements by Baldassari are at issue. The first category involves out-of-court statements made by Baldassari in Cotten's presence. The second category involves out-of-court statements by Baldassari that were made outside the presence of Cotten. We will address each type separately, as separate rules apply.

### 1. Statements of Baldassari in Presence of Cotten.

As noted, the trial court permitted Darren Williams to testify regarding statements Baldassari made on July 15, 1990, in the presence of Cotten. It did so, concluding that they: (1) constituted adoptive admissions under ER 801(d)(2)(ii); (2) were statements of a coconspirator during

---

[14]Instruction 7 provided that "[a] separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count."

[15]Cotten also asserts that severance of his trial from Baldassari's was required, because of the admission of the statements. The severance issue is virtually the same as the issue of whether the statements should have been admitted. Therefore, they have been addressed together.

the course and furtherance of the conspiracy under ER 801(d)(2)(v); and (3) were statements against the declarant's penal interest under ER 804(b)(3). On appeal, the State asserts only that the statements were admissible as adoptive admissions. We therefore limit our discussion to that issue.

ER 801(d)(2)(ii) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth . . .". A party-opponent can manifest adoption of a statement by words, gestures, or complete silence. *State v. Neslund*, 50 Wn. App. 531, 550-51, 749 P.2d 725, *review denied*, 110 Wn.2d 1025 (1988). Silence will only constitute an adoptive admission if the party-opponent heard the statement, was able to respond, and the circumstances surrounding the statement were such that it is reasonable to conclude that the party-opponent would have responded "had there been no intention to acquiesce". *Neslund*, 50 Wn. App. at 551. An adoptive admission is attributed to the defendant and becomes the defendant's own words. *Neslund*, 50 Wn. App. at 554-57. The right of confrontation is not implicated by the admission into evidence of the defendant's own incriminating out-of-court statements. *Neslund*, 50 Wn. App. at 554.

Williams stated that when Baldassari was telling him about the shooting on the Hilltop,

> the first person would say something and then the other person would add to this. Louis [Baldassari] would say something and Bryan [Cotten] would add to it, or if something was left out, Bryan would add something to what Louis said or vice versa.

Cotten also explicitly stated during the conversation, according to Williams, that "I didn't get one". After reviewing the record, we are satisfied that the trial court did not abuse its discretion in determining that Cotten adopted Baldassari's statements as his own. Even if the adoption of the statements was not accomplished by words, Cotten clearly heard Baldassari's statements and was able to respond. We believe

it is reasonable to conclude that a party would respond in such circumstances and, therefore, Cotten's failure to do so amounted to an adoptive admission by silence. The trial court did not abuse its discretion in allowing Darren Williams to testify about these out-of-court statements.

### 2. Statements of Baldassari Out of Cotten's Presence.

The analysis of statements made out of Cotten's presence presents a significantly different question. Cotten contends that the trial court's admission of these statements violated his rights under the confrontation clause of the Sixth Amendment. The trial court permitted Travis Hardesty, Edward Harris, and Darren Williams to testify about various out-of-court statements that Baldassari allegedly made outside of the presence of Cotten. It based its ruling that the statements were admissible on its reasoning that they "essentially did not implicate Mr. Cotten. They were with regard to statements made by Mr. Baldassari and those statements could be excised to the point where Mr. Cotten was, in effect, not implicated."

All of Baldassari's statements that were made outside Cotten's presence and were admitted at trial were admissible against Baldassari. *See* ER 801(d)(2)(i) (a "party's own statement" offered against the party is not hearsay). The issue here is whether the statements implicated Cotten and, if so, whether they were admissible at a joint trial. Severance is required only where a nontestifying codefendant's out-of-court statement refers to the defendant and is used by the State. *State v. Melton*, 63 Wn. App. 63, 67, 817 P.2d 413 (1991), *review denied*, 118 Wn.2d 1016 (1992).

The United States Supreme Court held in *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968) that a criminal defendant is denied the right "to be confronted with the witnesses against him" when a nontestifying codefendant's confession is introduced at a joint trial even if the jury is instructed to consider the confession only against the codefendant. U.S. Const. amend. 6; *see State v. St. Pierre*, 111 Wn.2d 105, 111-12, 759 P.2d 383 (1988). The *Bruton* rule was narrowed by the Court in *Richardson v.*

*Marsh*, 481 U.S. 200, 211, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987). The Supreme Court held there that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211. The *Richardson* Court compared its holding to *Bruton*, noting that "[o]n the precise facts of *Bruton*, involving a facially incriminating confession, we found [a limiting instruction] inadequate. . . . the calculus changes when confessions that do not name the defendant are at issue." 481 U.S. at 211.

Hardesty and Harris testified only in reference to the out-of-court statements of Baldassari that tended to implicate Baldassari in the murder of Wenard Wilson. The same can be said about Williams in regard to his testimony about the conversation between Harris and Baldassari. Significantly, none of these persons mentioned any statements by Baldassari in which Baldassari implicated, named, or even acknowledged the existence of Cotten as an accomplice.

The only way in which Cotten is implicated by the out-of-court statements is through linkage with other evidence presented by the State. The fact that the State links a nontestifying codefendant's confession through other evidence to the defendant's complicity in the crime is not, however, a sufficient reason to exclude the testimony under *Bruton*, nor does it mandate severance. *See Richardson*, 481 U.S. at 208-11 ("Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence."); *State v. Dent*, 123 Wn.2d 467, 486, 869 P.2d 392 (1994) (limiting instruction is rendered ineffective and severance is appropriate only when testimony includes " 'powerfully incriminating extrajudicial statements of a codefendant' " (quoting *Bruton*, 391 U.S. at 135-36)).

We conclude, therefore, that the testimony of Hardesty, Harris, and Williams was properly admitted at trial, and did not violate Cotten's right under the Sixth Amendment to

confront witnesses against him. Neither was severance of Cotten's trial from Baldassari's necessary.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MORGAN, C.J., and SEINFELD, J., concur.

Review denied at 126 Wn.2d 1004 (1995).