# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  45744-0-II |
| Respondent, | |
| v. | |
| RICKY ALLEN RIFFE, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Ricky A. Riffe appeals his convictions for first degree murder, first degree kidnapping, first degree robbery, and first degree burglary for the 1985 homicide of Ed and Minnie Maurin.

We hold that the trial court did not abuse its discretion when it (1) excluded Dr. Reinitz's testimony, (2) admitted two composite sketches of Riffe, (3) admitted Riffe's brother's statement about killing before as an adoptive admission, (4) admitted Riffe's former wife's question to police, and (5) did not allow Riffe to improperly impeach a witness with her prior inconsistent statements.  Next, we hold that Riffe's right to due process was not violated and the trial court did not abuse its discretion when it denied Riffe's motion for mistrial for the State's alleged failure to disclose information about a witness's plea agreement.  Finally, we reject Riffe's prosecutorial misconduct and cumulative constitutional error arguments, and his statement of additional grounds (SAG) claims.  Accordingly, we affirm Riffe's convictions.

FACTS

I. THE RIFFES

Rick Riffe and John Gregory Riffe ("Greg") were brothers and lived in Lewis County, Washington, near Mossyrock.[1] Riffe married Robin Riffe ("Robin") in the 1980s.

II. THE MAURINS

In 1985, Ed and Wilhelmina ("Minnie") Maurin[2] lived on a 120-acre farm located in rural Lewis County. Ed and Minnie were in their 80s and active in their community. Every year, Minnie hosted a party for a group of couples who belonged to her church, and had scheduled the party for December 19.

III. DECEMBER 19-20, 1985

On the morning of December 19, 1985, Dennis Hadaller, Minnie's son, picked up his son, Michael Hadaller, for work around 5:30 a.m. and they noticed the lights on in Ed and Minnie's house, which was unusual. Other people who passed by Ed and Minnie's home that morning also noticed the lights on, unfamiliar men, and unfamiliar vehicles outside of the residence.

Lindsey Senter, a log truck driver, passed by the Maurin residence between 8:00 and 9:00 a.m., and saw two men walking westbound between Harms Road and the Maurins' residence carrying an object about three feet long covered with a cloth. He was suspicious because he believed the object could be a rifle. Nonna Pierce, a neighbor, saw a strange car near Ed and

---

[1] To avoid confusion, we refer to individuals with the same last name by their first names. We mean no disrespect.

[2] Ed was Minnie's second husband. Her first husband, George Hadaller, predeceased her, and was the father of her children.

Minnie's driveway, and thought Ed and Minnie might need help when the car pulled in the driveway. Pierce heard voices, and assumed everything was fine.

Around 9:30 a.m., Patricia Hull, an employee of Sterling Savings Association, received a phone call from Ed informing her that he wanted to withdraw $8,500 in cash from his bank account. When Ed arrived at Sterling, Hull asked Ed to have a seat to wait for a cash courier,[3] Hull gave $8,500 cash to Ed, and Ed left.

Many people saw the Maurins' green Chrysler driving around the area near Mossyrock and on Bunker Creek Road on December 19. They described the car's occupants as an older couple and one or two younger men. Two of the witnesses described the younger man as being in his 20s and wearing a stocking cap and a green army jacket or trench coat.

Around 9:00 a.m., Jason Shriver, a resident of Mossyrock, also saw the Maurins' car on Highway 12. The car was traveling slowly and Shriver saw Ed and Riffe seated in the front and Minnie and Greg seated in the back. Greg was wearing a green army jacket, a stocking hat, and had a close beard.

Deputy William Forth was at the intersection of Bunker Creek Road and Highway 6 when he saw a full-sized green Chrysler coming toward him. The driver was a white male in his 20s with a short beard, and wore a stocking hat. Forth identified the driver as Riffe.

Several people, including Sheri Amell and Mary Jones, also saw Riffe and Greg with what appeared to be the Maurins' car in the parking lot of the Yardbirds shopping center on December 19. About 45 minutes after he first saw two men wiping down a green Chrysler in the

---

[3] Hull testified that the bank did not usually have the amount of cash on hand that Ed requested, and she had to send a Sterling employee to another bank to obtain it.

Yardbirds' parking lot, Gordon Campbell saw Riffe walking toward the shopping center. Riffe was wearing an olive drab coat and tight knit cap, and carrying what appeared to be a rifle. At midday, Amell, along with her friend Jones saw a man walking behind the containers in the Yardbirds' parking lot. Both Amell and Jones saw a 20-something dark-haired, bearded man, wearing a green army jacket, jeans, and a stocking cap, carrying a gun with something white draped around the trigger area of the gun. Amell later identified Riffe in a photomontage.

Brenda King also saw Greg, a regular customer of hers, get out of a 1969 Chrysler Newport in the Yardbirds' parking lot carrying a shotgun. Greg had longer dark hair and a beard, and was wearing a green army field jacket, jeans, and a stocking cap.

A number of other people also saw a man in his 20s with dark hair, an army jacket, and a hat of some kind, walking north from Yardbirds towards the Lewis County Mall carrying a rifle or shotgun wrapped or covered with a cloth or a towel. Other people recognized the green sedan sitting in the Yardbirds' parking lot on the evening of December 19, but did not see anyone around the vehicle.

Later on December 19, Shirley Hadaller, Dennis's wife, received a phone call from one of the people attending Minnie's luncheon. The woman told Shirley there was no one at the Maurins' residence. Finding this unusual, Shirley went to check on the Maurins at their residence, but found the house locked and their car gone. Shirley called Minnie's daughter, Hazel O'Berg, who contacted several other people, but no one had seen the Maurins. When Hazel and Shirley went through the Maurins' house, they found Minnie's purse still at the house and bank statements laid out in plain sight. Shirley and Hazel called the police.

4

## IV. Initial Police Investigation

On December 20, police found the Maurins' vehicle in the northeast corner of the Yardbirds parking lot. When Detective Glade Austin responded to the scene, there was blood found throughout the front of the car and blood dripping down the outside of the passenger side of the car. There were no bodies. Detective Richard Harrington and a Washington State Patrol crime scene technician processed the car.

Four days later, on December 24, a passing driver found the Maurins' bodies on the side of a rural road. Detectives Herrington, Austin, and Frank Bennett all responded to the scene. An autopsy confirmed that the Maurins had been shot with a sawed-off 12 gauge shotgun loaded with double-ought buckshot.

## V. The Composite Sketch and Additional Witnesses

About three days after the Maurins went missing, Amell and Jones contacted law enforcement regarding what they saw in the parking lot of Yardbirds on December 19. Amell and Jones met with a forensic artist who drew a composite sketch from their descriptions. Police distributed the composite sketch to the public.

Mossyrock residents who recognized Riffe from the composite sketch were too afraid to come forward because they feared reprisals from Riffe and Greg. About two weeks after the Maurins' bodies were discovered, two residents, Jerry Nixon and Gary Newberry, witnessed Greg threatening Jason Shriver, who had seen Riffe and Greg with the Maurins on December 19.

On December 20, Detective Bennett contacted Pierce, the Maurins' neighbor. Pierce gave a recorded statement regarding the headlights she saw in the Maurins' driveway the morning of December 19. On December 22, she called back and said she needed to report something that

happened "two weeks prior." Clerk's Papers (CP), Ex. 697. Detective Bennett's police report stated that Pierce reported that on that day, an older red Ford pickup followed her home. Pierce described the driver of the pickup as 6 feet tall, approximately 30 years old, 170-75 pounds, with dark brown hair and a mustache. She only saw the man that one time.

## VI.  THE SHOTGUN

In October 1984, Les George, a friend of Riffe's, asked Riffe to go with him to purchase a single-shot 12-gauge shotgun and double-ought buckshot. In early 1985, George asked Riffe to cut down about an inch off the shotgun barrel, which Riffe did. Riffe showed the sawed-off shotgun to his brother-in-law, father-in-law and son.

At trial, George testified that Riffe returned the shotgun sometime before the summer of 1986. Riffe requested that George put a "speedy finish" on the gun because he did not want his fingerprints on it. Verbatim Report of Proceedings (VRP) at 2124. George found out that the gun was too short and not legal, he did not want to put it in his truck, and left it in a closet at his mother Linda Zandecki's home. After Zandecki discovered the shotgun, her husband, Richard Zandecki, disposed of it in Mayfield Lake. Richard did not tell George what he had done with it.

## VII.  GREG'S STATEMENT ABOUT KILLING

In 1986, Riffe began dating Cathy Thola. On one occasion in 1986 or 1987, Thola and Riffe had an argument about her leaving him. When Thola threatened to leave Riffe, Greg responded, stating, "We've killed once. We can kill again." VRP at 2713. Riffe smiled, nodded, snickered, and said, "Yeah." VRP at 2713, 2744.

## VIII. CONTINUED POLICE INVESTIGATION

Around 1987, both Riffe and Greg moved to Alaska. The investigation into the Maurins' homicide continued, but the case stalled between 1987 and 1991. In the early 1990s, Detective David Neiser contacted Robin by telephone, who was in prison in Arizona at the time. When Detective Neiser identified himself and explained that he needed to speak with her about an old homicide that had occurred in Lewis County, Robin replied, "You mean the one where the two old people were killed?" VRP at 1464, 1494.

In February 1992, Lewis County detectives, assisted by Alaska State troopers, went to Alaska to interview Riffe. Riffe voluntarily gave an interview, and provided police his fingerprints, palm prints, and a hair sample. Riffe said he had been living in Alaska since the summer of 1990, and admitted that he cut down a 12-gauge shotgun for George. Riffe said that he had the shotgun for a couple weeks, and he fired it using double-ought buckshot that he got from George. Riffe stated that he used to have a green army fatigue jacket and that Greg probably had one as well, but denied that either he or Greg were involved in the Maurins' murder.

Detectives also interviewed Greg, who was also living in Alaska. Alaska State troopers assisted Lewis County Sheriff's Office in serving a warrant and obtaining Greg's fingerprints and hair sample. Greg initially denied killing the Maurins, but then he said, "I don't know. I need to think about it," and he began to cry and terminated the interview. VRP at 3105.

In 2005, Lewis County Sheriff's Detective Bruce Kimsey took over the Maurin homicide case investigation. During his investigation, Kimsey interviewed witnesses who identified either Riffe or Greg from photomontages shown to them. In June 2012, Detective Kimsey contacted Pierce who provided him with another recorded statement of what she saw and heard on

7

December 19, 1985, and identified Riffe as the man who had followed her home and approached her house on December 18, 1985. After requesting a warrant to arrest Riffe and Greg, Detective Kimsey found out that Greg had died. Kimsey obtained an arrest warrant for Riffe and arrested him.

After Riffe's arrest, more witnesses began coming forward. Erwin Bartlett, who spent time with Riffe in the Lewis County Jail, also came forward as a witness. According to Bartlett, Riffe admitted to him that he had killed two elderly people. Riffe never told Bartlett who helped him in the murders.

On July 6, 2012, the State charged Riffe with first degree murder (counts 1 and 2), first degree kidnapping (counts 3 and 4), first degree robbery (counts 5 and 6), and first degree burglary (count 7). All counts carried special allegations of the following aggravating factors: (1) particularly vulnerable victim, (2) lack of remorse, and (3) accomplice.[4] In addition to the three special allegations, counts 3 through 7 contained the special allegation of deliberate cruelty and count 7 contained the special allegation of victim present during burglary.

## IX. TRIAL

Trial took place in October and November 2013. Ninety witnesses testified about the events on December 19-20, 1985, and many identified Riffe and Greg. Several of those witnesses personally knew Ed and Minnie and testified to seeing Riffe and Greg driving around town with the Maurins on December 19-20, including the trip to the bank and other suspicious activity.

---

[4] In this case, accomplice liability, RCW 9A.08.020, was not charged as a separate count, but included as a "Special Allegation—Aggravating Circumstance" for all of the charges brought against Riffe by the State. CP at 1-7.

Bartlett, Riffe's cellmate, testified at trial. In exchange for his trial testimony, Bartlett sought leniency or a plea bargain from the State on his pending drug charge. The State offered Bartlett a reduced sentence in exchange for his testimony against Riffe; and, if Bartlett did not testify, he faced a potential enhancement to his sentence. During trial, Riffe argued that the prosecutor committed misconduct by soliciting false testimony from Bartlett regarding the terms of the plea deal. Without objection from Riffe, the State admitted Bartlett's plea agreement at trial and called Bartlett's attorney to testify about the plea agreement.

The trial court made several evidentiary rulings that Riffe challenges on appeal. First, the trial court excluded testimony offered by Riffe's expert, Dr. Reinitz, on eyewitness identification and memory. Next, the trial court admitted into evidence (1) two composite sketches of Riffe, (2) the statement by Greg, to Thola, and (3) Robin's question in response to Detective Neiser's inquiry about an old homicide case. Third, it did not allow Riffe to impeach the Maurins' neighbor, Pierce, with her prior inconsistent statements. Finally, the trial court denied Riffe's motion for mistrial related to Bartlett's testimony and plea bargain.

The jury found Riffe guilty on all counts and their aggravating factors. The trial court sentenced Riffe to 1,234 months in prison. Riffe appeals his convictions.

ANALYSIS

I. DR. REINITZ'S EXPERT TESTIMONY

A. Qualifying an Expert Under ER 702

Riffe argues that the trial court abused its discretion when it denied his motion to admit Dr. Reinitz as an expert witness and excluded his testimony under ER 702. We disagree.

No. 45744-0-II

We review a trial court's decision to exclude expert testimony for an abuse of discretion. *State v. Willis*, 151 Wn.2d 255, 262, 87 P.3d 1164 (2004). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *State v. Lamb*, 175 Wn.2d 121, 128, 285 P.3d 27 (2012). ER 702 governs admissibility of expert testimony and provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

There is no need for an expert opinion if the issue is a matter of common knowledge, and the inexperienced person is capable of forming correct judgment based on his or her own experience and knowledge. *See State v. Smissaert*, 41 Wn. App. 813, 815, 706 P.2d 647 (1985); *see* 5D KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 702.6, at 315-16 (2014-2015 ed.). The fact that a court has allowed an expert's testimony on a particular issue does not necessarily mean that another court errs by excluding the same expert's testimony on the same issue. *See Ward*, 55 Wn. App. at 383-35 (explaining that a trial court's admission of expert testimony is determined by balancing factors in the context of facts specific to each case).

To preserve an error predicated on the exclusion of evidence, ER 103(a)(2) requires the defendant to make an adequate and timely offer of proof. *See State v. Ray*, 116 Wn.2d 531, 538-39, 806 P.2d 1220 (1991) (stating that, under ER 103(a)(2) an offer of proof is generally required in order for the court to make an informed ruling on the admissibility of evidence); ER 103(a)(2). Although ER 103 does not require a defendant to present live testimony in a detailed offer of proof,

10

the substance of the evidence must be apparent from the questions asked or from their context, and make it clear to the court why the evidence is admissible. *Ray*, 116 Wn.2d at 539.

At trial, defense counsel moved to admit the testimony of Dr. Reinitz on the unreliability of memory and eyewitness identification. The State filed a motion in limine to prohibit his testimony. The trial court denied Riffe's motion to admit Dr. Reinitz and granted the State's motion in limine. In its written ruling, the trial court found that (1) Riffe failed to meet his burden of showing that Dr. Reinitz was qualified under ER 702 as an expert on eyewitness identification and reliability, (2) the subject matter was within the common knowledge, experience, and understanding of the jury, (3) his testimony would not be helpful to the jury, and (4) his testimony would be an improper comment on the veracity of the witnesses.

Defense counsel did not have Dr. Reinitz testify in an oral offer of proof. Instead, counsel summarized Dr. Reinitz's testimony in oral argument and in a memorandum and provided the doctor's two-page curriculum vitae listing studies on eyewitness testimony. Riffe never provided the trial court with copies of any of the doctor's articles, nor did he provide transcripts or the substance of the Dr. Reinitz's testimony in previous court cases. Even after the offer of proof, the trial court still lacked a satisfactory explanation of what the expert would testify about or how the expert's testimony would be helpful to the jury.

We agree with the trial court that (1) Riffe failed to show that Dr. Reinitz qualified as an expert, (2) the proposed testimony was within the common knowledge, experience, and understanding of the jury, (3) the proposed testimony was not helpful to the jury, and (4) Dr. Reinitz's testimony was an improper comment on the veracity of the witnesses. Therefore, we

conclude that the trial court did not abuse its discretion by excluding Dr. Reinitz's proposed testimony under ER 702.

B. Due Process

Riffe also argues that by excluding Dr. Reinitz's testimony, the trial court violated his due process rights under the Sixth and Fourteenth Amendments. We disagree.

We review an alleged due process violation de novo. *State v. Statler*, 160 Wn. App. 622, 636, 248 P.3d 165 (2011). The Sixth and Fourteenth Amendments of the United States Constitution guarantee persons accused of a crime the right to a fair trial, and the Washington Constitution provides a similar safeguard. *Statler*, 160 Wn. App. at 637; WASH. CONST. art. I, §§ 3, 22. A defendant in a criminal case has the right to an opportunity to be heard, including the right to examine witnesses against him and to offer testimony. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). But the right to a fair trial does not require a "'perfect'" trial. *Statler*, 160 Wn. App. at 637 (quoting *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 267, 172 P.3d 335 (2007)).

A defendant does not have an absolute right to present evidence, and the defendant must adhere to the rules of evidence and other procedural limitations. *Jones*, 168 Wn.2d at 720. A defendant's constitutional right to present a defense "does not extend to the introduction of otherwise inadmissible evidence." *State v. Aguirre*, 168 Wn.2d 350, 363, 229 P.3d 669 (2010). And a trial court's exercise of discretion to exclude expert testimony under ER 702 does not violate a defendant's constitutional rights to present a defense *See Moses v. Payne*, 555 F.3d 742, 759 (9th Cir. 2009). As a result, to prevail on his right to present a defense claim, Riffe was required

to establish that Dr. Reinitz's testimony met the requirements of ER 702. *See Jones*, 168 Wn.2d at 720.

As discussed above, the trial court did not abuse its discretion in excluding Dr. Reinitz's testimony under ER 702. Accordingly, we hold that the exclusion of that testimony did not violate Riffe's right to present a defense.

## II. THE COMPOSITE SKETCHES

Riffe argues that the trial court erred in admitting two composite sketches of Riffe for "illustrative purposes" because the sketches were hearsay, were not authenticated, violated his Sixth and Fourteenth Amendment rights, and were prejudicial. Br. of Appellant at 63-64. However, Riffe withdrew his initial objection based on hearsay (which the court sustained) and then waived further objection to the trial court admitting the two sketches.[5] Therefore, his argument fails.

We generally will not consider an issue that a party raises for the first time on appeal unless it is a manifest error affecting a constitutional right. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); RAP 2.5(a)(3). However, RAP 2.5(a)(3) is not meant to afford criminal defendants a means for a new trial whenever they can identify some constitutional error not raised during trial. *McFarland*, 127 Wn.2d at 333. To warrant review, a defendant must identify the error and show how the alleged constitutional error actually affected the outcome of the trial. *McFarland*, 127 Wn.2d at 333. Even when the alleged error affects the defendant's confrontation

---

[5] Riffe argues that both Amell and Jones, the witnesses who helped create the two composite sketches, were required to be available for cross-examination, but Jones had died by the time of trial.

clause right, the alleged error must be "evident, unmistakable, or indisputable" to be raised for the first time on appeal. *See State v. Lynn*, 67 Wn. App. 339, 346, 835 P.2d 251 (1992). If the facts necessary to adjudicate the claimed error are not in the record on appeal, we do not reach the merits of the alleged error, there is no actual prejudice shown, and the error is not manifest. *McFarland*, 127 Wn.2d at 333.

When the State initially sought to admit the first composite sketch, Riffe objected based on hearsay and chain of custody. The trial court sustained the objection until Amell,[6] who provided the description for the sketch, could testify. The State then called Amell to testify. She testified that, after the Maurins' homicide, she and Jones met with law enforcement and met with the forensic artist who created the composite sketches based on their descriptions.

After Amell's testimony, the State moved to admit the first and second composite sketches, Riffe's counsel responded, "No objection." VRP at 1691, 1695. Riffe never renewed his objection to Jones's unavailability and the trial court admitted the sketches without further objection. Because Riffe did not renew his objection to Jones' unavailability and the trial court did not have an opportunity to rule on the motion, Riffe waived any objection to admissibility based on hearsay or foundation and waived his right to require the State to produce Jones or prove her unavailability. Accordingly, Riffe fails to show that the alleged error is a manifest constitutional error that would allow him to raise this argument for the first time on appeal.RAP 2.5(a)(3).

---

[6] By the time of trial, Amell had married and changed her name. In 1985, her surname was Amell, and we continue to refer to her by this name to avoid unnecessary confusion.

III. RIFFE'S ADOPTIVE ADMISSION

Next, Riffe argues that the trial court abused its discretion in admitting his brother Greg's statement as an adoptive admission under ER 801(d)(2)(ii). Riffe argues that he did not adopt Greg's statement, that the statement is prejudicial, and that the trial court violated his state and federal constitutional right to confrontation. We disagree.

A. ER 801(d)(2)(ii)

We review a trial court's admission of evidence for an abuse of discretion. *State v. Stacy*, 181 Wn. App. 553, 565, 326 P.3d 136 (2014). An out of court statement offered to prove the truth of the matter asserted is hearsay. ER 801(c). But a statement offered against a party opponent is not hearsay. ER 801(d)(2). This includes "a statement of which the party has manifested an adoption or belief in its truth." ER 801(d)(2)(ii).

A party can manifest an adoption of a statement by words, gestures, or complete silence. *State v. Cotten*, 75 Wn. App. 669, 689, 879 P.2d 971 (1994). A party's silence manifests an adoption of the statement if (1) the party heard the incriminatory statement, (2) the party was able to physically and mentally respond, and (3) the circumstances indicate that he reasonably would have responded had he not intended to acquiesce in the statement. *State v. Neslund*, 50 Wn. App. 531, 551, 749 P.2d 725 (1988).

Approximately one year after the Maurins' homicide, Thola, Riffe's girlfriend, was arguing with Riffe and Greg. When Thola said that she would end her relationship with Riffe, Greg responded by saying, "We've killed once. We can kill again." VRP at 2713. Riffe then smiled, snickered, nodded, and said, "Yeah." VRP at 2713, 2744.

The statement, "We've killed once. We can kill again," suggested that Riffe was complicit with Greg in a killing, and is the type of statement that one would ordinarily deny if the statement was untrue and if Riffe did not intend to acquiesce in the statement. *See Neslund*, 50 Wn. App at 551. Riffe adopted this statement by his words and gestures when he smiled, snickered, nodded, and responded, "Yeah."

B. Prejudice Under ER 403

Riffe argues that the trial court should have excluded the statement as more prejudicial than probative under ER 403. He claims that the statement was not probative because it was ambiguous as to whether Greg was referring to killing the Maurins or whether he was referring to killing someone else. We disagree.

Evidence must be excluded under ER 403, even if relevant, if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Embry*, 171 Wn. App. 714, 777-78, 287 P.3d 648 (2012). There is a danger of unfair prejudice when evidence is more likely to stimulate an emotional response rather than a rational decision. *State v. Beadle*, 173 Wn.2d 97, 120, 265 P.3d 863 (2011). But evidence is not inadmissible simply because it is detrimental or harmful to the interests of the party opposing its admission; it is unfairly prejudicial only if it has the capacity to skew the truth-finding process. *State v. Read*, 100 Wn. App. 776, 782-83, 998 P.2d 897 (2000), *adhered to on remand*, 106 Wn. App. 138, 22 P.3d 300 (2001).

Greg's statement to Thola, made one year after the Maurins' homicide, was not ambiguous, and the statement and Riffe's response of "Yeah" goes to the weight of the evidence of his complicit guilt in the Maurins' murders, not to the statement's relevance. While not favorable to Riffe, Greg's attributed statement is not the kind of evidence "likely to stimulate an emotional

16

response" nor is it the kind of evidence that we have determined skews the fact-finding process. *See Embry*, 171 Wn. App. 778 (gang evidence); *see Beadle*, 173 Wn.2d at 121 (third party testimony regarding veracity of emotional breakdown); *see State v. Avendano-Lopez*, 79 Wn. App. 706, 719-20, 904 P.2d 324 (1995) (questions regarding defendant's immigration status). This statement is of the type that one would ordinarily deny if not true. The statement's probative value showing Riffe's complicity in the murders outweighed the danger of any unfair prejudice. Thus, the trial court did not abuse its discretion admitting Greg's statement as an adoptive admission against Riffe under ER 801(d)(2)(ii).[7]

C.  Confrontation

A defendant has a right to "be confronted with the witnesses against him." U. S. CONST. amend. VI. The rules of evidence and the confrontation clause prohibit the admission of witness testimony given at a prior hearing unless the party against whom the testimony is offered has an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. *State v. DeSantiago*, 149 Wn.2d 402, 411, 68 P.3d 1065 (2003). But the right of confrontation is not implicated by the admission into evidence of the defendant's own incriminating out-of-court statements, including adoptive admissions. *Cotten*, 75 Wn. App. at 689.

---

[7] Rick also argues that we should reject the adoptive admission rule. But Washington courts and ER 801 allow into evidence statements of third parties that are adoptive admissions of the defendant. *State v. Davis*, 141 Wn.2d 798, 847, 10 P.3d 977 (2000); *Cotten*, 75 Wn. App. at 689; *Neslund*, 50 Wn. App. at 552-53. Rick fails to show that this established precedent is harmful or incorrect.

Because Greg's statement is treated as Riffe's own statement under ER 801(d)(2)(ii), Riffe's Sixth Amendment right of confrontation is not implicated. *Cotten*, 75 Wn. App. at 689. His argument fails.

## IV. ROBIN'S QUESTION TO POLICE

Riffe next argues that the trial court improperly admitted as hearsay Robin's question to the police detective, "You mean the one where the two old people were killed?" when he asked her about an old homicide. Br. of Appellant at 80. The trial court ruled that, because her response was a question, not a statement, it was not hearsay. We agree that the statement was not hearsay under ER 801(c).

For an out of court statement to be hearsay, it must be a statement and offered for the truth of the matter asserted. ER 801(c). ER 801 defines a statement as "an oral or written assertion or . . . nonverbal conduct of a person, if it is intended by the person as an assertion." ER 801(a). A question or an inquiry is not an assertion and therefore is not a hearsay statement. *State v. Collins*, 76 Wn. App. 496, 498, 886 P.2d 243 (1995).

When Detective Neiser contacted Robin by telephone, he identified himself and told Robin that he needed to speak with her about an old homicide that had occurred in Lewis County. Robin replied, "You mean the one where the two old people were killed?" VRP at 1464.

Her response was a question, not a declarative statement, and therefore is not hearsay under ER 801(c). The trial court did not abuse its discretion in admitting Robin's response to the police detective into evidence.

V.  PIERCE'S PRIOR INCONSISTENT STATEMENT

Next, Riffe argues that the trial court violated his Sixth Amendment right to a fair trial and confrontation, and his Fourteenth Amendment right to due process and right to present a defense when it prevented him from impeaching Pierce with her prior inconsistent statement to Detective Kimsey.  We reject his arguments.

We review a trial court's ruling on the scope of cross-examination for a manifest abuse of discretion, which is a decision that is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons.  *State v. Perez*, 139 Wn. App. 522, 529-30, 161 P.3d 461 (2007) at 531. A trial court has considerable discretion to determine the scope of cross-examination.  *Perez*, 139 Wn. App. at 529; *State v. Darden*, 145 Wn.2d 612, 620-21, 41 P.3d 1189 (2002).  We review alleged constitutional violations de novo.  *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). While both the United States and Washington State Constitutions guarantee criminal defendants the right to confront and cross-examine witnesses, there are two limits on that right—(1) the evidence must be relevant and (2) the defendant's right to introduce relevant evidence is balanced against the State's interest in precluding evidence so prejudicial as to affect the fairness of the fact-finding process.  *Perez*, 139 Wn. App. at 529.

Any party may impeach a witness in an effort to undermine his or her credibility.  *State v. Classen*, 143 Wn. App. 45, 59, 176 P. 3d 582 (2008).  Parties offer impeachment evidence, usually prior inconsistent statements, solely to show that the witness is not truthful, but the parties may not offer impeachment evidence to argue that the witness is guilty or even that the facts contained in the prior statement are substantively true.  *State v. Burke*, 163 Wn.2d 204, 218, 181 P.3d 1 (2008). Extrinsic evidence of a prior inconsistent statement is inadmissible unless the

19

witness declarant has the opportunity to explain or deny the statement, and the non-introducing party is able to interrogate the witness. ER 613(b).

Testimony of a prior inconsistent statement allows an adverse party to show that the witness is telling different stories at different times and is unreliable *State v. Newbern*, 95 Wn. App. 277, 295, 975 P.2d 1041 (1999). Even if a witness cannot remember making a prior inconsistent statement, if the witness testifies at trial to an inconsistent story, there is still a compelling need for the jury to know the witness is unreliable. *Newbern*, 95 Wn. App. at 293.

Pierce, the Maurins' neighbor, testified that she first spoke to Detective Bennett on December 20, 1985, and that a man, who matched Riffe's description, came to her home on December 18, 1985. According to Detective Bennett's 1985 police report, Pierce stated that a person in an older red Ford pickup truck parked outside her home, knocked on her door, asked if her husband was home, and then asked for gas. She described the person then as 6 feet tall, approximately 30 years old, 170-75 pounds, with dark brown hair, a mustache, and wearing blue jeans, a plaid shirt, and a blue jean jacket. In June 2012, Pierce gave a recorded statement[8] to Detective Kimsey where she identified Riffe as the man she saw on December 18, 1985, from a photomontage, but expressed doubt and concern about her identification.

During direct examination at trial, Pierce testified that a man knocked on her door on December 18, 1985, and she described the man as "probably maybe 5-foot-9" and in his "mid to late 20's" with a "medium build" and "dark hair," and wearing "jeans" and a "blue jean jacket." VRP at 228-29. The prosecutor showed her a photograph that Detective Kimsey had shown her

---

[8] Pierce did not sign the transcript of the June 2012 recorded statement.

in June 2012, on which were handwritten the words, "Looks the most like the person you saw on December 18, 1985." VRP at 248. The prosecutor then asked her, "Is your testimony today that the individual in this photograph that you selected out is absolutely 100 percent the person you saw on your front porch that day?" VRP at 235. She responded, "Yes. I believe with all my heart, yes, it is." VRP at 235.

Riffe moved to admit Detective Bennett's 1985 report and the transcript of Pierce's 2012 recorded statement to Detective Kimsey and then sought to impeach her with these statements. The State objected to the admission of either document as substantive evidence under ER 613(b) and to Riffe's impeaching Pierce with the summary in Detective Bennett's 1985 police report because it was not her actual statement. The trial court agreed with the State, denied the admission of both documents, and precluded Riffe's counsel from using Detective Bennett's 1985 police report to impeach her.

The trial court permitted Riffe to recall Pierce three days later to cross-examine her again. In this second attempt, the trial court permitted Riffe to use the transcript of Pierce's June 2012 recorded statement to Detective Kimsey for impeachment. Riffe pointed out that, in her direct examination, the prosecutor asked Pierce if she was "absolutely 100 percent" that the man on her porch on December 18, 1985, was Riffe, and Pierce answered, "Yes, I believe with all my heart, yes, it [was]." VRP at 235. But, that in the June 2012 transcript, Pierce said that she was "not 100 percent sure" that she had correctly identified the photograph in the montage as the same person who was on her porch on December 18, 1985. VRP at 605.

Riffe argues that the trial court should have admitted Detective Bennett's 1985 report during Pierce's first cross-examination because it still contained her statement, even if it was not written by her. But a statement in a police report is generally inadmissible as hearsay unless it falls within a hearsay exception. *State v. Garcia*, 179 Wn.2d 828, 848, 318 P.3d 266 (2014). Riffe cites to *State v. Nelson*, 74 Wn. App. 380, 389, 874 P.2d 170 (1994). In *Nelson*, the officer wrote down what the witness dictated and the witness then signed the statement. *Nelson*, 74 Wn. App. at 389-90. This case is unlike *Nelson* because Riffe failed to show that what Detective Bennett wrote down as Pierce's statement was accurate or that Pierce had adopted the statement attributed to her in Bennett's report. Riffe's argument fails.

Riffe also argues that, under this court's holding in *State v. Garland*, 169 Wn. App. 869, 887, 282 P.3d 1137 (2012), Pierce's statement to a police officer should be viewed as a party-opponent statement and attributed to her. However, in *Garland*, the trial court held that defense counsel's opening statement in trial may be admissible to impeach the defendant. *Garland*, 169 Wn. App. at 887. Riffe fails to show how a statement made by a defendant's representative on the record, in open court, is equivalent to a witness's statement that was not recorded, or written in her own hand, or made under oath. Accordingly, the trial court did not abuse its discretion in ruling that Riffe could not use Detective Bennett's own record to impeach Pierce. The substance of Pierce's prior 1985 statement to Detective Bennett was not admissible under ER 613(b), and the trial court did not abuse its discretion in denying admission of her statement in Bennett's 1985 police report. Thus, Riffe fails to show a violation of his constitutional rights or prejudice.

## VI. MOTIONS RELATED TO BARTLETT'S PLEA BARGAIN

Riffe argues that his right to due process was violated when the State failed to fully disclose its plea negotiations[9] with Bartlett and that the trial court abused its discretion by denying his motion to disqualify the prosecutor or dismiss[10] the charges following Bartlett's testimony. Riffe then argues that the prosecutor elicited false testimony from Bartlett and did not correct his testimony. We hold that the trial court properly denied Riffe's motion as there was no prosecutorial misconduct, Bartlett's plea agreement was available in the court file and fully disclosed by Bartlett's counsel during his testimony, and Riffe fails to show any prejudice.

A trial court has broad discretion to deny a motion for mistrial and we review it for an abuse of discretion. *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013), *review denied*, 179 Wn.2d 1026 (2014). We will overturn a trial court's denial of a mistrial motion only when there is a substantial likelihood that the error affected the jury's verdict and when the defendant has been so prejudiced that nothing short of a new trial can remedy the error. *Garcia*, 177 Wn. App. at 776. We find an abuse of discretion when a trial court denies a mistrial only when no reasonable judge would have reached the same conclusion. *Garcia*, 177 Wn. App. at 776.

A defendant alleging prosecutorial misconduct bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). To show prejudice, a defendant must demonstrate a substantial likelihood that

---

[9] Riffe cites *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[10] On appeal, Riffe refers to this motion as one for a mistrial. Riffe never requested a mistrial related to Bartlett's testimony, nor did the trial court rule on a motion for mistrial. The trial court properly found that any error was cured when Bartlett's attorney, David Arcuri, testified about the plea negotiations.

the misconduct affected the jury verdict. *Emery*, 174 Wn.2d at 760-61; *State v. Hecht*, 179 Wn. App. 497, 503, 319 P.3d 836 (2014). To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012), *cert. denied*, 183 Wn.2d 117 (U.S. Oct. 19, 2015). We examine the effect of a prosecutor's alleged improper conduct in the context of the trial as a whole—the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). A prosecutor has wide latitude in making arguments to the jury and may draw reasonable inferences from the evidence. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).

Bartlett, who spent time with Riffe in the Lewis County Jail, testified at trial. The State offered Bartlett a reduced sentence on his pending drug charge in exchange for his testimony against Riffe; if Bartlett did not testify, he faced a potential enhancement to his sentence. Bartlett testified at trial that Riffe talked about the Maurins' murders, and said it was a bad choice on his part and a "jackass move." VRP at 2898. Bartlett also testified that Riffe stated that he had killed two old people, but that the person who helped him was "no longer with us" so he did not need to worry. VRP at 2895. Riffe never disclosed that person's identity to Bartlett.

Riffe argues that the prosecutor knowingly asked questions that Bartlett answered falsely and failed to correct Bartlett's testimony when he [Bartlett] denied receiving any consideration for his testimony. After Bartlett's testimony, Riffe moved to disqualify the prosecutor or dismiss the

charges because he claimed that the prosecutor committed misconduct during Bartlett's examination. Riffe cites the following exchange between the prosecutor and Mr. Bartlett:

[Prosecutor]: You haven't been sentenced yet; correct?
[Bartlett]: No, sir.
[Prosecutor]: What consideration from the State have you received?
[Bartlett]: None, and I was told by you that I wouldn't get any.

VRP at 2901.

Riffe asserts that Bartlett's statement was false because he had already entered into plea negotiations and his plea offer stated: "[Defendant] pleads as charged, sentencing is continued to a date after Riffe trial. [Defendant] to testify truthfully if called as a witness by the State. 30 days all options otherwise State will seek high end and may add enhancement for contraband in jail." CP, Ex. 963 at 10.

But the State also called Bartlett's counsel, David Arcuri, to testify about Bartlett's plea agreement and explain the plea negotiations; the State also admitted the plea agreement into evidence, without objection. After hearing Arcuri's testimony, the trial court found that Riffe and his counsel had full access to the plea agreement in the court's file, the State did not withhold the plea agreement's details or engage in prosecutor misconduct, and any error was cured by Arcuri's testimony explaining the plea negotiations. We agree. Accordingly, we hold that Riffe's right to due process was not violated and the trial court did not err when it denied Riffe's motion for mistrial and found that (1) the State fully disclosed the plea agreement, (2) Riffe had access to the entire plea agreement, and (3) no prosecutorial misconduct occurred. Riffe fails to show any prejudice because any error was cured by Arcuri's testimony, and his argument fails.

25

VII.  PROSECUTORIAL MISCONDUCT

Riffe also argues that the prosecutor misstated the law of accomplice liability and committed misconduct when the State argued during closing arguments that, as long as Riffe and Greg committed any act in concert, they were both guilty of murder.  Because Riffe did not object to the alleged misconduct and he fails to show that the prosecutor's remark was so flagrant and ill-intentioned that it caused prejudice that could not have been cured, his arguments fail.

Failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by admonition to the jury.  *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).  We focus less on whether the prosecutor's misconduct was flagrant or ill-intentioned and more on whether the resulting prejudice could have been cured.  *Emery*, 174 Wn.2d at 762.  Simply because improper remarks could potentially confuse a jury about its role and the burden of proof, and touch upon a defendant's constitutional rights, does not mean that they are incurable.  *Emery*, 174 Wn.2d at 763.

During closing arguments, the prosecutor made the following comment to the jury regarding the principle of accomplice liability:

> You are the driver.  You know somebody is going to go rob the bank, you are sitting outside, you never go inside the bank, but you are sitting outside and you got the engine started and you are ready to go.  Guy runs out, oops, you didn't know it, but when he was in the bank he shot five people.  Guess what?  You are on the hook.

Br. of Appellant at 61-62 (quoting VRP at 4027).

Riffe argues that no admonition to the jury would have successfully remedied the error in this case because the State relied on the theory throughout the trial that Riffe and Greg were "interchangeable" actors. Br. of Appellant at 63. But this explanation goes to the State's theory of the case, not to whether the prosecutor misstated the law to the jury during closing argument. Furthermore, these are not the kind of remarks that we find so inflammatory as to be incurable by instruction. *See Emery*, 174 Wn.2d at 763 (citing the prosecutors remarks in *State v. Belgarde*, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) referring to the American Indian defendant as part of "'a deadly group of madmen'" and "'butchers'" (emphasis and internal quotation marks omitted)). Riffe provides no explanation as to why a curative instruction would not have remedied the alleged error. *See Thorgerson*, 172 Wn.2d at 443 (stating that failure to object to an improper remark waives the error unless the resulting prejudice was incurable by an instruction to the jury). Had Riffe timely objected to the remarks, a curative instruction would have clarified the law of accomplice liability for the jury, and reaffirmed the jury's duty and the burden of proof.

Moreover, even if the prosecutor misstated the law during closing argument, jury instruction 6, patterned after 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 26.01, at 359 (3d ed. 2008) (WPIC), accurately conveyed the law on first degree murder, and jury instruction 10, patterned after WPIC 10.51, at 217, accurately defined accomplice liability. Riffe did not object to either instruction. We presume that the jury follows the court's instructions. *Emery*, 174 Wn.2d at 766. Thus, Riffe's arguments here fail.

## VIII. NO CUMULATIVE ERROR

Riffe argues that we should reverse his convictions because the constitutional errors he alleges are presumptively prejudicial and the State fails to prove that the errors are harmless beyond a reasonable doubt. We disagree.

Even where several errors standing alone do not warrant reversal, the cumulative error doctrine requires reversal when the combined effect of the errors denied the defendant a fair trial. *Garcia*, 177 Wn. App. at 786. Absent prejudicial error, there is no cumulative error depriving the defendant of a fair trial. *State v. Saunders*, 120 Wn. App. 800, 826, 86 P.3d 232 (2004). Because we find no errors in the trial court's rulings and Riffe fails to demonstrate actual prejudice from any alleged error, we find no cumulative constitutional error that warrants reversal of his convictions.

## IX. STATEMENT OF ADDITIONAL GROUNDS (SAG)

In his SAG, Riffe argues that his Sixth Amendment right to a fair trial and the appearance of fairness doctrine were violated when Dennis Hadaller, the Maurins' son, hired two private investigators to identify witnesses and collect information subsequently used at trial. Riffe asserts that Hadaller:

> [I]s an important man in Lewis County . . . [and] he was the Lewis County Commissioner for years. In the early 2000's he hired private investigator's [sic] . . . to find evidence to convict my brother and I. It was only after he hired these two investigators that old "witnesses" started to change their statements. This investigation was in no way independent and unbiased.

SAG at 1. Riffe also claims that the appearance of fairness doctrine was violated because Detective Kimsey and Hadaller were friends. He cites a Virginia case holding that a private prosecutor, hired

by a victim's family, cannot take over prosecution of a case from the public prosecutor. *See Adkins v. Commw. of Va.*, 26 Va. App. 14, 19, 492 S.E.2d 833 (1997).

"'Under the appearance of fairness doctrine, a judicial proceeding is valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing.'" *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995) (quoting *State v. Ladenberg*, 67 Wn. App. 749, 754-55, 840 P.2d 228 (1992), *reversed on other grounds by State v. Finch*, 137 Wn.2d 792, 975 P.2d 967 (1999)). However, our Supreme Court has held that this doctrine does not implicate constitutional rights. *State v. Tolias*, 135 Wn.2d 133, 140, 954 P.2d 907 (1998). As a result, Riffe's appearance of fairness claim is not a constitutional error under RAP 2.5(a)(3) and this issue may not be raised for the first time on appeal.

Riffe cites no evidence in the record or authority to support his claims. We will not consider an appellant's SAG for review if it does not inform the court of the nature and occurrence of alleged errors and we are not obligated to search the record to support those claims. RAP 10.10(c). We reject Riffe's SAG claims.

CONCLUSION

We hold that the trial court did not abuse its discretion when it (1) excluded Dr. Reinitz's testimony, (2) admitted two composite sketches of Riffe, (3) admitted Riffe's brother's statement about killing before as an adoptive admission, (4) admitted Riffe's former wife's question to police, and (5) did not allow Riffe to improperly impeach witness Pierce with her prior inconsistent statements. Next, we hold that the Riffe's right to due process was not violated and trial court did not abuse its discretion when it denied Riffe's motion for mistrial for the State's alleged failure to disclose information about witness Bartlett's plea agreement. Finally, we hold that Riffe's

No. 45744-0-II

prosecutorial misconduct and cumulative constitutional error arguments, and his SAG claims, fail.

Accordingly, we affirm Riffe's convictions.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

SUTTON, J.

We concur:

MAXA, P.J.

LEE, J.

30