# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

        Respondent,

v.

CHRISTOPHER XAVIER BECK,

        Appellant.

No. 74103-9-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: September 5, 2017

TRICKEY, A.C.J. — Christopher Beck appeals his convictions of three counts of first degree rape and one count of robbery in the second degree. Beck contends that the trial court abused its discretion when it declined to sever his counts and try them separately; deprived him of his constitutional right to an impartial jury when it denied a defense challenge for cause against a juror; and deprived him of his right to present a defense when it barred him from introducing evidence attacking the credibility and motive to lie of a victim. Finding no error, we affirm.

## FACTS

### C.Q.

C.Q. was a massage therapist who provided services at her apartment in downtown Seattle. C.Q. placed advertisements on Backpage.com, and would perform erotic massages including "energetic release" at the end.[1] C.Q. did not allow clients to touch her. C.Q. usually accepted cash payment, but sometimes allowed clients to pay with credit cards. When a client paid with a credit card, the payment would go to Rainbow Love, an acquaintance of C.Q., who would give C.Q. cash later.

---

[1] Report of Proceedings (RP) (Aug. 25, 2015) at 626.

In February 2014, Beck called C.Q. in response to her Backpage.com advertisement. He set up an appointment and asked to pay with a credit card. Although it appeared that the payment had gone through, the card company Beck used notified Love that she should not accept payments from that card because the account was fraudulent.

Beck's appointment with C.Q. went normally. C.Q. learned later that the payment had been rejected. Beck contacted Love because he was "trying to make this right," and Love told C.Q. to contact Beck.[2] C.Q. and Beck exchanged e-mails and arranged to meet on March 4, 2014, for Beck to pay C.Q. for the past appointment. When Beck arrived, he told C.Q. that he was not going to pay her. Beck physically assaulted C.Q., including choking her, and then forced her to perform oral sex.

C.Q. was expecting her friend Carmen Garcia to arrive shortly after Beck. After knocking on C.Q.'s door, Garcia heard the sounds of a struggle and a female voice that sounded as if it was being choked saying, "Call 911."[3] Garcia began to alert tenants in other apartments. Beck, identified by Garcia at trial, came out of C.Q.'s apartment and fled. Garcia went into C.Q.'s apartment and saw that C.Q. had marks on her neck and shoulders and that the contents of a purse had been emptied onto the floor. C.Q. reported the incident a few days later, and pictures were taken of her injuries.

## C.F.

In March 2014, C.F. had lost her job and apartment and moved to a motel in the Georgetown area of Seattle. During that time, C.F. began using heroin. C.F. was living with her friend April Bucklin, Bucklin's boyfriend, Bucklin's son, and C.F.'s boyfriend at

---

[2] RP (Aug. 25, 2015) at 639.
[3] RP (Sept. 8, 2015) at 1302-03.

the motel. C.F. posted advertisements on Craigslist offering to sell her underwear for money or food.

On March 13, 2014, Beck e-mailed C.F. in response to one of her Craigslist advertisements. Beck and C.F. arranged to meet at the motel. Beck asked C.F. to get into his car, but C.F. refused and Beck left. A short time later, Beck e-mailed or texted C.F. to apologize and offer her money again and to take her to the store to get food. C.F. accepted.

C.F. let her friends know she was leaving. C.F. got into Beck's car and he took her to a McDonald's restaurant. After parking, Beck choked C.F. and attempted to force her to perform oral sex. When she resisted, Beck threatened her life, forced her into the back seat, and vaginally raped her. C.F. escaped and fled the car in only her shirt and shoes, and was picked up by a stranger and returned to the hotel.[4] She left her cell phone and other clothes in Beck's car.

Bucklin called 911 when C.F. returned to the motel. Seattle Police Department (SPD) Officer Stephen Smith responded to the call. Officer Smith saw that C.F. was visibly upset. A deoxyribonucleic acid (DNA) analysis and comparison was performed using a sexual assault kit, and the male component matched Beck.

<u>A.M.</u>

A.M. is an independent insurance claims adjuster and corporate trainer who lived in Florida but frequently traveled for work. While traveling, A.M. worked "in the adult industry doing erotic massage work."[5] A.M. placed advertisements on Backpage.com in cities where she would be working.

---

[4] RP (Sept. 1, 2015) at 938-39.
[5] RP (Sept. 8, 2015) at 1361.

A.M. traveled to Seattle in March 2014. She booked a room at the Westin Hotel in downtown Seattle and placed several advertisements. Beck responded to one of the advertisements by e-mail. They arranged to meet on March 19. When Beck arrived, A.M. gave him a standard description of what he could expect, which implied that that she did not permit mutual contact.

Beck repeatedly tried to confirm A.M.'s rate, which was unusual for a client and made A.M. uncomfortable. When A.M. would not confirm the rate, Beck began to move toward her and A.M. attempted to cancel the appointment. Beck responded that he was going to "get what [he] came for" and began to choke A.M.[6] A.M. blacked out. When A.M. regained consciousness, Beck forced A.M. to perform oral sex and vaginally raped her. Beck took the money that A.M. had made from earlier appointments and left.

A.M. tried but was unable to continue with the other appointments she had scheduled for that day. A.M. contacted hotel security and met with SPD officers. The officers observed that A.M. was "very upset."[7]

A.M. went to Harborview Medical Center. A DNA analysis of samples collected with a sexual assault kit matched DNA from Beck.

<u>Criminal Proceedings</u>

The State charged Beck by second amended information with rape and robbery for his assaults on the three women: rape in the first degree and robbery in the second degree of C.Q. on March 4, 2014; rape in the first degree of C.F. on March 13, 2014; and rape in the first degree and robbery in the second degree of A.M. on March 19, 2014.

At pretrial, Beck moved to sever the counts for each alleged victim. The trial court

---

[6] RP (Sept. 8, 2015) at 21.
[7] RP (Sept. 8, 2015) at 1132.

4

denied the motion to sever, stating that there was enough indication of a common scheme or plan under ER 404(b) and that the prejudicial effect did not substantially outweigh the probative value of the evidence under ER 403. Beck renewed his motion to sever during trial.

The jury convicted Beck on all three counts of rape and one count of robbery. It found him not guilty of his charge of robbery in the second degree against A.M.

Beck appeals.

## ANALYSIS

### Motion to Sever

Beck argues that the trial court abused its discretion when it denied his motion to sever his counts related to each victim from one another. He argues that the trial court's erroneous denial of his motion to sever allowed the admission of unduly prejudicial evidence, and thus, violated his constitutional right to a fair trial and CrR 4.4(b). Because the evidence of Beck's charges would have been cross-admissible in separate trials since Beck acted pursuant to a common plan or scheme, we disagree.

A defendant has a constitutional right to due process and a fair trial. U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 3. When a defendant faces multiple charges, the trial court shall grant a motion to sever if it determines "that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b).

CrR 4.3 provides:

> **(a) Joinder of Offenses.** Two or more offenses may be joined in one charging document, with each offense stated in a separate count, when the offenses, whether felonies or misdemeanors or both:
> (1) Are of the same or similar character, even if not part of a single scheme or plan; or

5

(2) Are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

A defendant seeking severance has the burden of demonstrating that trying the counts together would be manifestly prejudicial and outweigh any concern for judicial economy. State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990). Joinder of offenses may prejudice a defendant because

> "(1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find."

State v. Smith, 74 Wn.2d 744, 755, 446 P.2d 571 (1968) (quoting Drew v. United States, 331 F.2d 85, 88 (D.C. Cir. 1964)), vacated in part, 408 U.S. 934, 92 S. Ct. 2852, 33 L. Ed. 2d 747 (1972), overruled on other grounds by, State v. Gosby, 85 Wn.2d 758, 539 P.2d 680 (1975). Also, a defendant may be prejudiced by "'a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.'" Smith, 74 Wn.2d at 755 (quoting Drew, 331 F.2d at 88).

A reviewing court uses several factors to determine whether a trial court's denial of a severance motion was unduly prejudicial to the defendant:

> (1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.

State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).

"A trial court's refusal to sever counts under CrR 4.4(b) is reviewed for manifest abuse of discretion, and the defendant has the burden of demonstrating that abuse on appeal." State v. Cotten, 75 Wn. App. 669, 686-687, 879 P.2d 971 (1994).

6

*Strength of the Evidence*

Beck argues that the strength of the State's evidence for certain counts bolstered its case against him for counts where its evidence was weaker. Beck also argues that joinder invited the jury to cumulate the evidence and to infer criminal disposition, rather than relying on the evidence presented for each count. Because there was no clear difference in the strength of the State's case for each rape and each was supported by strong evidence, we disagree.

The court considers the strength of the State's evidence on each count to ensure that weaker counts are not unduly benefitted by stronger counts. Russell, 125 Wn.2d at 63-64.

Beck argues that the State did not have strong evidence on any of the counts against him and, therefore, the trial court's failure to sever his counts invited the jury to infer a criminal disposition from the accumulated evidence. But Beck's arguments primarily focus on the credibility of the State's witnesses.[8] Beck raised a consent defense against the rape allegations at trial and did not dispute identity. He denied taking property from C.Q. or A.M.

Beck's defense was that the victims consented to sexual activity and intercourse. The evidence that each victim did not consent was strong. The State offered substantial testimony from the victims themselves, police testimony corroborating the victims' demeanors following their encounters with Beck, and forensic evidence supporting their allegations. Their testimony directly contradicted Beck's consent defense.

---

[8] Beck focuses on C.Q.'s and Garcia's involvement with prostitution, C.F.'s drug use and homelessness, and A.M.'s delayed reporting of the rape to law enforcement and use of racially derogatory terms.

Each rape count against Beck largely depended on the jury's determination of the credibility of Beck and the victims. Beck's credibility arguments focused on the background of the victims and their alleged motivations to fabricate their allegations. His arguments did not show that the strength of the State's cases varied by victim. We conclude that the State presented strong evidence supporting each count.

*Clarity of Defenses*

Beck argues that he was prejudiced by the trial court's denial of his motion to sever because he needed to testify about certain counts but not others. Specifically, he argues that he asserted a general denial defense for each count but presented different theories as to each victim's motive to fabricate their allegations against him.[9] We disagree because Beck presented general denial or consent defenses to each charge and, therefore, trying the counts together did not infringe on the clarity of his defenses.

In State v. York, the trial court denied York's pretrial motion to sever counts of rape of female students at the school where York was an instructor. 50 Wn. App. 446, 447, 749 P.2d 683 (1987). The Court of Appeals affirmed the trial court's denial, holding that York was not embarrassed or confounded in presenting his defenses because his defense to one charge was a denial and his defense to the others was consent. York, 50 Wn. App. 451.

Here, Beck contended at trial that each victim had consented. Beck argues on appeal that, although he asserted a general denial defense for each count, he offered different theories as to each victim's motive to fabricate their allegations against him. This does not change the nature of his legal defenses against each count, only their underlying

---

[9] Beck characterizes his defense as a general denial, but at trial he characterized his defense as consent with each victim having a different motivation to fabricate their rape allegation.

facts. We conclude that Beck was not embarrassed or confounded in presenting his defenses.

Beck also argues that the trial court's denial of his severance motion violated his right against self-incrimination because he had to testify about certain counts but not others. Because Beck has not shown that he had important testimony to offer on one count and a strong need to refrain from testifying about another, we disagree.

A defendant has a right against self-incrimination. U.S. CONST. amend. V; WASH. CONST. art. 1, § 9.

"A defendant's desire to testify only on one count requires severance only if a defendant makes a 'convincing showing that she has important testimony to give concerning one count and a strong need to refrain from testifying about another.'" Russell, 125 Wn.2d at 65 (quoting State v. Watkins, 53 Wn. App 264, 270, 766 P.2d 484 (1989)).

Beck has not made this showing. Beck has not identified, here or at the trial court, which counts he wished to testify to or which counts to which he had a strong need to refrain from testifying. He has not carried his burden of showing that he had important testimony to offer on one count and a strong need to refrain from testifying to another, and was unable to do so because of the trial court's ruling.

In support of his position, Beck cites his argument at trial that the court should limit the scope of cross-examination if he testified about some counts but not others. Beck cited below to State v. Hart, which held that the trial court infringed the defendant's constitutional right against self-incrimination when it allowed the State to cross-examine him about the facts underlying a charge that he did not testify to on direct examination.

9

180 Wn. App. 297, 304-05, 320 P.3d 1109 (2014). Hart does not apply here, because Beck testified to all of his charges on direct examination. Further, it is not relevant to Beck's claim that he would have testified to only some of his charges if the court had severed the counts.

Beck also asserts that the jury was prejudiced against him after being informed of his prior criminal history. Beck does not offer significant analysis or citation to the record in support of this argument. At trial, on direct examination, Beck's attorney asked him about his guilty plea to a charge for robbery in the first degree based on an incident in Pierce County in 2010. Assuming that this is the prior criminal history Beck is referring to, Beck has not shown that he would not have testified to any charge to which his prior criminal conviction was relevant or that his prior criminal history would not have been admissible at each trial. In addition, this is insufficient to show prejudice standing alone.

In sum, Beck has not offered persuasive argument showing an issue with the clarity of his defenses. He was not embarrassed or confounded in presenting his defenses. He did not make a convincing showing that he had important testimony to give on one count and a strong need to refrain from testifying about another. Beck has not shown that he would have only testified to some counts and not to others or that the court would have excluded his prior criminal conviction in a trial on some counts if they had been tried separately.[10] We conclude that Beck has not shown that there was an issue with the clarity of his defenses.

---

[10] Beck states that he did make this showing in his brief, but does not cite to the record in support of this assertion.

*Court Instructions*

Beck argues that the court's instructions, although proper,[11] could not overcome the improper joinder of his counts. The jury was instructed to consider and decide each count separately, and to only consider evidence related to other counts for the limited purpose of determining whether a common scheme or plan existed. We conclude that the jury was properly instructed.

*Admissibility of Other Charges If Not Joined*

Beck argues that the trial court erred when it found that evidence supporting each of Beck's rape charges would be cross-admissible because they constituted a common scheme or plan. Because evidence of the rapes would have been cross-admissible at separate trials, we disagree.

Cross-admissibility of evidence is analyzed under ER 404(b). Bythrow, 114 Wn.2d at 722; State v. Gatalski, 40 Wn. App. 601, 607, 699 P.2d 804 (1985) (analyzing whether evidence in each count would be admissible in a trial on a separate count). ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of prior misconduct may be admissible to prove "a scheme or plan of which the offense charged is a manifestation." State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). One type of plan "arises when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes." Lough, 125 Wn.2d at 855. If

---

[11] Beck objected to the trial court's limited purpose instruction as inadequate, relying on his severance arguments.

similar acts have been performed over a period of time, this may strengthen the possibility of a common plan or scheme. Lough, 125 Wn.2d at 860 (citing State v. McKinney, 110 N.C. App. 365, 372, 430 S.E.2d 300 (1993)).

"Proof of such a plan is admissible if the prior acts are (1) proved by a preponderance of the evidence, (2) admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial." Lough, 125 Wn.2d at 852.

"[A]dmission of evidence of a common scheme or plan requires substantial similarity between the prior bad acts and the charged crime." State v. DeVicentis, 150 Wn.2d 11, 21, 74 P.3d 119 (2003). "Sufficient similarity is reached only when the trial court determines that the 'various acts are naturally to be explained as caused by a general plan . . . .'" DeVicentis, 150 Wn.2d at 21 (quoting Lough, 125 Wn.2d at 860). This standard does not require uniqueness, which applies to identifying the defendant through a unique modus operandi. DeVicentis, 150 Wn.2d at 21; State v. Vy Thang, 145 Wn.2d 630, 643, 41 P.3d 1159 (2002).[12]

In State v. Gresham, the Supreme Court affirmed the trial court's finding of a common scheme or plan when the defendant created opportunities to fondle child victims using the same pattern, such that instances were "naturally to be explained as 'individual manifestations' of the same plan," despite differences in location and the sexual acts performed. 173 Wn.2d 405, 423, 269 P.3d 207 (2012). In DeVicentis, the Supreme Court held that the "existence of a design to fulfill sexual compulsions evidenced by a pattern of past behavior is probative." 150 Wn.2d at 17-18. The court affirmed the trial court's

---

[12] Beck conceded below that identity was not at issue.

admission of the defendant's prior convictions involving sexual misconduct with young adolescent girls based in part on the defendant's building of relations with his victims through "'a safe channel, such as a friend of his daughter,'" and wearing revealing clothing around his victims in order to make nudity normal. Devicentis, 150 Wn.2d at 22.

Here, the rape allegations against Beck bore sufficient similarity to one another to have occurred under a common scheme or plan. In each instance, Beck responded to online advertisements offering money in exchange for sexual services or favors. The victims were unlikely to avail themselves of help from law enforcement due to being vulnerable or marginalized. After meeting the victims in isolated locations, Beck refused to pay them, choked them, and forced them to engage in sexual activities. These acts occurred over the course of 15 days. Because of the similarities between the incidents and their occurrence over a period of time, we conclude that trial court did not abuse its discretion in finding that the three rape charges would be cross-admissible in separate trials as part of a common scheme or plan.[13]

In sum, any prejudice suffered by Beck from trying the counts together did not outweigh the concern for judicial economy. The State presented comparatively strong evidence supporting each count against Beck. Beck raised consent defenses to each count, and the clarity of his defenses were not infringed by the denial of his severance motion. The trial court properly instructed the jury to determine each count separately. The evidence of each count would have been admissible in separate trials because they

---

[13] The trial court excluded a separate rape allegation against Beck filed in Kitsap County from the common scheme or plan because it involved multiple rapes over a span of five hours and a child was present.

13

were part of a common scheme or plan. The trial court did not abuse its discretion when it denied Beck's motion to sever.

### Right to an Impartial Jury

Beck argues that he was denied his constitutional right to an impartial jury when the trial court denied a defense for-cause challenge against Juror 106 for exhibiting actual bias. Because Beck failed to show actual bias on the part of the juror, we disagree.

A defendant is entitled to an impartial jury. State v. Brett, 126 Wn.2d 136, 157, 892 P.2d 29 (1995). The court must excuse a juror for cause if the juror demonstrates actual bias. Ottis v. Stevenson-Carson Sch. Dist. No. 303, 61 Wn. App. 747, 754, 812 P.2d 133 (1991). Actual bias is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2).

Actual bias may exist when a juror admits to a bias and indicates that it is likely to persist throughout the trial. State v. Gonzalez, 111 Wn. App. 276, 281, 45 P.3d 205 (2002), review denied, 148 Wn.2d 1012 (2003).[14] "[E]quivocal answers alone do not require a juror to be removed when challenged for cause, rather, the question is whether

---

[14] Beck also offers Mach v. Stewart for the proposition that the trial court should have begun anew with a fresh jury pool after Juror 106's comments. 137 F.3d 630 (9th Cir. 1997). In Mach, the Ninth Circuit concluded that the trial court erred when it struck a prospective juror for comments about her bias but denied a motion for a new panel. 137 F.3d at 632-33. The Ninth Circuit stated that the trial court should have conducted additional voir dire to determine whether other jurors had been influenced by the comments, and remanded for new voir dire with a fresh jury pool. 137 F.3d at 633. Mach is not persuasive here. Beck challenged the entire panel for cause after approximately two-thirds of the jurors, including Juror 106, raised their hands when asked whether they would be biased by the number of counts against him. The court denied this "group challenge for cause" and instructed Beck to make individual cause challenges. RP (Aug. 24, 2015) at 505. Beck was allowed to proceed with further voir dire to ensure that the jurors were not actually biased against Beck, as evidenced by his questioning of Juror 106. The trial court did not err in denying Beck's "group challenge for cause" and not starting anew with a fresh jury pool.

14

a juror with preconceived ideas can set them aside." State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

A trial court's ruling on a challenge for cause is reviewed for manifest abuse of discretion. State v. Gregory, 158 Wn.2d 759, 814, 147 P.2d 1201 (2006).

Here, Juror 106 did not exhibit actual bias. Juror No. 106 was one of many jurors who indicated that they were concerned that they were more likely to find Beck guilty because there were several charges against him. When questioned by Beck's attorney, Juror 106 said, "So with the culmination of the amount of accusations, for me, it was shocking. So it's overwhelming for me to be unbiased as to how I feel whether or not Mr. Beck is guilty or not but persuaded to be more so than if he is guilty based on those type of accusations."[15] In response to further defense questions, however, Juror 106 said, "But I would still want to hear the proof that has to be given in order for me to say that [Beck] is guilty."[16] After a defense for-cause challenge against Juror 106, the trial court allowed additional questioning by the prosecution. In response to the prosecutor's questions, Juror 106 stated that he would be able to "make an unbiased decision based on the evidence."[17] The trial court then denied the defense for-cause challenge, and the defense did not use a preemptory strike against Juror 106.

Beck has not shown actual bias on the part of Juror 106. Juror 106 repeatedly stated that, although he may be more inclined to feel that Beck was guilty, he was capable of making an unbiased decision of guilt based on the evidence presented at trial. The trial court allowed for additional questioning of Juror No. 106, and was satisfied that Juror

---

[15] RP (Aug. 24, 2015) at 493-94.
[16] RP (Aug. 24, 2015) at 494.
[17] RP (Aug. 24, 2015) at 497.

106 could try the issue impartially and without prejudice. We conclude that the trial court did not err when it denied Beck's for-cause challenge against Juror 106.

## Right to Present a Defense

Beck argues that the trial court denied him his right to present a defense when it excluded evidence of a criminal investigation into Love that Beck offered to establish C.Q.'s bias and motive to lie. Because the State's need to exclude the evidence of the criminal investigation into Love outweighed Beck's need to present it at trial, we conclude that the trial court did not infringe Beck's constitutional right to present a defense.

An accused person has a right to a meaningful opportunity to present a defense. WASH. CONST. art. I, § 22; State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). But this right is not absolute. Jones, 168 Wn.2d at 720. The evidence offered by a defendant must be at least minimally relevant. Jones, 168 Wn.2d at 720. If the evidence is relevant, the court balances the State's interest in excluding the evidence against the defendant's need for the evidence. Jones, 168 Wn.2d at 720.

A claim of denial of constitutional rights is reviewed de novo. State v. Iniguez, 167 Wn.2d 273, 280-81, 217 P.3d 768 (2009).

*Relevancy of Evidence*

Beck argues that evidence of the investigation into Love was relevant to C.Q.'s credibility and C.Q.'s "vulnerability as a minor player in [the prostitution ring being investigated] supported her motive to lie about Mr. Beck, in order to protect Rainbow Love, as well as herself."[18] Beck contends that the evidence was necessary to show the jury an accurate portrayal of C.Q.'s lifestyle, and that the criminal investigation of Love

---

[18] Opening Br. of Appellant at 31.

motivated C.Q. to lie and biased her against Beck. The State argues that C.Q. had already admitted to her prostitution activities, and thus, cross-examination into the investigation of Love for prostitution-related activities would produce testimony that was not relevant.

"Evidence that a defendant seeks to introduce 'must be of at least minimal relevance.'" Jones, 168 Wn.2d at 720 (quoting State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002)). "Defendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence." Jones, 168 Wn.2d at 720 (citing Gregory, 158 Wn.2d at 786 n.6). Relevant evidence is that which tends to make the existence of any material fact more or less probable. ER 401. Evidence of bias, which "describe[s] the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party[,]" is almost always relevant. United States v. Abel, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L. Ed. 2d 450 (1984).

Beck argues that the evidence would have been at least minimally relevant to the questions of C.Q.'s credibility, motive to lie, or bias. He offers the conclusory argument that C.Q. was biased against him because of the investigation into Love.[19] Assuming that C.Q. knew of the investigation, this would likely meet the low threshold of establishing that the evidence would have been relevant to the material facts of C.Q.'s credibility and

---

[19] Whether C.Q. was aware of the investigation into Love is unclear from the record. Beck attempted to ask questions about the investigation during cross-examination, and the court sustained the State's objection. During recess, the trial court ruled that it was going to exclude the evidence about the Love investigation. C.Q. was not asked further questions about the investigation.

motive to lie. Therefore, the evidence would have been at least minimally relevant to the question of C.Q.'s credibility or bias against Beck.

*Prejudice Verses Need for Information*

Beck argues that the evidence was properly offered under ER 404(b). He argues that the evidence was of high probative value, and thus, should have been admitted. The State argues that the evidence was not highly probative, and admitting it would have led to confusion of the issues and been a waste of time.

If the evidence at issue is relevant, the State bears the burden to show that the evidence is "so prejudicial as to disrupt the fairness of the fact-finding process at trial." Darden, 145 Wn.2d at 622. The State's interest in excluding prejudicial evidence is weighed against the defendant's need for the information sought. Darden, 145 Wn.2d at 622. Relevant information can only be withheld "if the State's interest outweighs the defendant's need." Darden, 145 Wn.2d at 622. If evidence is highly probative, no State interest is compelling enough to preclude its introduction. State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1984).

Here, the State's interest in excluding the evidence of the investigation into Love outweighed Beck's need for the evidence. The evidence would have been prejudicial to C.Q. by implicating her in organized prostitution. It also may have confused the issues for the jury by raising the question of whether C.Q. would be criminally liable for her involvement in the prostitution ring and would have taken up time.

Moreover, the record shows that the State's interest was not outweighed by Beck's need. The evidence would have been offered to show C.Q.'s possible criminal liability for her activities, her motivation to falsify her allegation of rape to avoid this criminal liability,

18

and her bias against Beck. Beck already had evidence to support these arguments. C.Q. testified about her prostitution activities, her concern that she would be criminally liable if she reported the rape, and the fact that Beck had refused to pay her.[20] She also testified about her connections with Love, including being trained by Love, Love's role in referring clients to C.Q., and Love's handling of credit card transactions for C.Q.

C.Q.'s testimony to these issues significantly reduced the probative value of the evidence offered by Beck. The State's interest in excluding the prejudicial evidence was not outweighed by Beck's need for it. Thus, Beck's right to present a defense was not infringed by the trial court's exclusion of evidence regarding the investigation of Love.

## Statement of Additional Grounds

Beck raises a number of issues in his statement for additional grounds for review. None merit reversal or dismissal.

*C.Q.*

Beck argues that the trial court erred or the State acted wrongfully when evidence showing that C.Q. was dishonest was not admitted or disclosed to the defense. First, Beck's argues that the trial court erroneously excluded evidence that a ledger C.Q. claimed Beck stole was later found in her possession. This appears to refer to the trial court's decision to exclude evidence related to the investigation of Love, as analyzed above. The list of items seized from the apartment does not include a ledger and the ownership of the items was not established in the record. Beck acknowledged that the State presented substantial documentation during discovery. Beck has not shown that the trial court erred or that the State acted wrongly with regard to this evidence.

---

[20] Beck focuses on the disagreement over payment as a reason for her false allegation, along with possible criminal liability.

Second, Beck argues that forensic evidence showed that C.Q. was not truthful when she claimed Beck used a rope to bind her hands. C.Q. testified that Beck attempted to tie her hands and feet with a rope he brought with him. It is unclear from the record what forensic evidence Beck is referring to that contradicts this claim. RAP 10.10(c).

Third, Beck claimed that C.Q. was dishonest about him ejaculating on her clothing. At trial, C.Q. testified that he ejaculated on her, not her clothing. The record does not appear to contain a reference to Beck ejaculating on her clothing.

Fourth, C.Q. testified that Beck took three cell phones from her. The fact that these cell phones were not found in his possession is insufficient to overcome C.Q.'s sworn testimony.

Beck argues that that the trial court erred when it excluded evidence of C.Q.'s involvement in Love's prostitution ring because he was denied an opportunity to impeach C.Q. or attack her credibility. As analyzed above, the trial court did not err when it excluded evidence of the criminal investigation into Love's prostitution activities.

Beck argues that the prosecutor improperly asked C.Q. whether she knew of Love's past convictions by leaving the courtroom during cross-examination to ask her. The jury had left the courtroom and the court and counsel were discussing legal questions. The prosecutor left the room and asked C.Q. if she was aware that Love had ever been convicted of any criminal offense after being ordered to do so by the court. The prosecutor stated on the record the language he used to ask the question and C.Q.'s response. Beck has not shown that this was improper or that the trial court erred.

*A.M.*

Beck argues that photographs of a used condom, which would have undermined A.M.'s testimony that she did not have sexual intercourse with other clients because Beck testified that he did not use a condom, were erroneously excluded. The record does not appear to contain references to a used condom. RAP 10.10(c).

Beck argues that the State and SPD acted improperly during their investigation into his case. Specifically, Beck argues that they failed to investigate whether A.M. had sexual intercourse with other clients, failed to interview those other clients, and failed to preserve or investigate other evidence, such as the used condom or the sexual devices used by A.M. with her clients. The State does not have an obligation to expand the scope of a criminal investigation. State v. Judge, 100 Wn.2d 706, 717, 675 P.2d 219 (1984). "The police are required only to preserve that which comes into their possession either as a tangible object or a sense impression, if it is reasonably apparent the object or sense impression potentially constitute material evidence." State v. Hall, 22 Wn. App. 862, 867, 593 P.2d 554 (1979). SPD did not act improperly when it declined to preserve or investigate the evidence cited by Beck.

*C.F.*

Beck argues that C.F. and Bucklin were not credible due to their drug use and that there was no forensic evidence showing that he and C.F. did not engage in consensual sexual intercourse. Credibility determinations are for the trier of fact and are not subject to review. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Challenges to evidence not based on the relevancy of evidence go toward the weight of the evidence, not its admissibility. Gregory, 158 Wn.2d at 835, overruled on other grounds by State v.

W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014). Beck's challenges to C.F. and Bucklin's testimony go toward the weight of their testimony rather than its admissibility. The lack of forensic evidence at trial does not overcome C.F.'s testimony. The facts offered by Beck in support of this ground were offered by Beck at trial, and contradict those offered by C.F. The jury was free to believe C.F.'s account over Beck's.

*Juror 23*

Beck argues that the trial court erred by denying a defense request to remove Juror 23 and by failing to dismiss the jury pool after Juror 23 discussed possible racial bias with defense counsel during voir dire. As discussed above, a trial court errs when it fails to dismiss a juror who exhibits actual bias. Juror 23 did not exhibit actual bias. When questioned about the multiplicity of charges, Juror 23 stated that he would be able to follow the court's instructions. Juror 23 expressed that his upbringing could have influenced his views toward black people, but stated that he did not hold the same prejudices as his peer group and did not think it would be a factor in his decision-making during trial. Moreover, Juror 23 was not empaneled as a jury member, and the record does not show that Juror 23 had any influence over the jury's deliberations. Beck has not shown that Juror 23 was actually biased against him, nor that Juror 23 influenced the jury's ultimate decision.

In sum, Beck has not raised any issue that warrants dismissal or reversal in his statement of additional grounds for review.

Affirmed.

_Trickey, ACJ_

WE CONCUR:

_Leach, J._

_Appelwick, J._